465 So.2d 42 (1985)
Sonya Arlene MILLER
v.
The UPJOHN COMPANY et al.
Charlene Linette MILLER
v.
The UPJOHN COMPANY et al.
Nos. 83 CA 1355, 83 CA 1356.
Court of Appeal of Louisiana, First Circuit.
January 10, 1985.
Rehearing Denied February 21, 1985.
Writ Denied April 19, 1985.
*43 C. John Caskey, Baton Rouge, Joseph H. Simpson, Amite, for plaintiffs-appellees.
John J. Weigel and Donna G. Klein, New Orleans, for defendant-appellant.
Before WATKINS, CRAIN and ALFORD, JJ.
WATKINS, Judge.
This is an action for the discoloration of the teeth of Sonya Arlene Miller and Charlene Linette Miller, and damage to the outer enamel layer of Charlene Linette Miller's teeth allegedly resulting from the taking *44 of Panalba over a one week's course by Charlene and Sonya beginning with a prescription given December 30, 1963, and Panmycin over a one week's course by Charlene alone beginning with a prescription given February 8, 1965. Both drugs contain tetracycline, and were distributed by The Upjohn Company. At the time the drugs were prescribed, both plaintiffs, Sonya Miller and Charlene Miller had their "baby" teeth. The staining manifested itself on the adult teeth, which emerged later. The physician who prescribed Panalba, Dr. Scarle, and the physician who prescribed Panmycin, Dr. Newall, have both since died. After a jury trial, judgment was rendered against The Upjohn Company, the distributor of the drugs, and J. Killian Williams, detail man for Upjohn, in the sum of $75,000 in favor of Charlene Miller and $65,000 in favor of Sonya Miller. Upjohn and Williams have appealed. We affirm the judgment in favor of plaintiffs against Upjohn, but reverse the judgment against Williams, dismissing the suit as to Williams. The adult teeth of both plaintiffs are stained grayish-yellow, and Charlene's teeth in addition have enamel hypoplasia (pitting of the enamel) which the testimony of dental experts indicates the jury could reasonably have found resulted from the taking of the two drugs containing tetracycline.
Tetracycline as sold by Upjohn was marketed by Upjohn under license from Bristol-Myers. By 1963, Panalba and Panmycin both had been on the market approximately eight years. A different form of tetracycline was distributed by Lederle Laboratories. In the period after the drugs were placed on the market (some eight years before 1963) Lederle had received reports of tooth discoloration after taking the drug. Upjohn received no such reports. In the late fifties several articles by Dr. Schwachman of Harvard Medical School demonstrating staining in the teeth of children with cystic fibrosis appeared. Also several other articles appeared during the late fifties reporting on laboratory animals having yellow flourescents in bones, including teeth following dosages of tetracycline. In October 1962 an article appeared in a British medical journal, Lancet, indicating a study revealed a higher incidence of tooth discoloration in children who had taken tetracycline. In November 1962, Lederle applied to the Food and Drug Administration for a warning concerning tooth discoloration resulting from the taking of tetracycline. In February 1963, the FDA advised tetracycline manufacturers that a warning regarding tooth discoloration should be included in package inserts on drugs at the next printing. In the meanwhile, the 1963 Physician's Desk Reference[1] had been published and distributed, which omitted the reference to tooth discoloration, but which included it in the 1964 edition, after Charlene and Sonya Miller had taken the tetracycline.
The 1964 warning which appeared in the Physician's Desk Reference read as follows:
"(name of product) may form a stable calcium complex in any bone-forming tissue with no serious harmful effects reported thus far in humans. However, use of (name of product) during tooth development (= last trimester of pregnancy, neonatal period and early childhood) may cause discoloration of the teeth (= yellow-grey-brownish). This effect occurs mostly during long-term use of the drug but it has also been observed in usual short treatment courses."
Thus, it was reasonable for the jury to have concluded that had the approval of the FDA been obtained earlier for a warning of discoloration, no discoloration would have occurred in the present case, as the drugs would not then have been prescribed.
The trial court charged the jury that Upjohn would be held to strict liability if it distributed a defective product (i.e. one that had the side effect of causing tooth discoloration) without warning of that side effect. Louisiana founds strict liability in *45 products liability cases upon unreasonable risk of harm existing in the product or goods distributed or manufactured, as the case may be. A product is unreasonably dangerous if "the article which injured the plaintiff was dangerous to an extent beyond that which would be contemplated by an ordinary consumer". DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981), at page 30.
Most prescription drugs necessarily carry with them the possibility of side effects. Hence, the manufacturer must warn of the side effects. Schneider v. Eli Lilly and Co., 556 F.Supp. 809 (E.D.La. 1983) As it would be unjust to hold a manufacturer liable for side effects of which it could not reasonably be expected to have knowledge, a manufacturer will be held liable for side effects of which it either knows or should have known, but not for side effects of which it cannot reasonably be expected to know. Although strict liability in products liability cases exists in normal circumstances independent of a finding of negligence, DeBattista v. Argonaut-Southwest Ins. Co., supra, it is at the point of warning of drug side effects that negligence and strict liability become one and identical. Feldman v. Lederle Laboratories, 97 N.J. 429, 479 A.2d 374 (1984).
Thus, an adverse side effect coupled with absence of sufficient warning of the side effect renders the product unreasonably hazardous and defective, and hence causes strict liability to take effect.
The relevant part of the instructions to the jury is as follows:
... Plaintiffs, Sonya Miller and Charlene Miller, ask for judgment against the drug manufacturer, defendant, based on two theories. Strict liability and negligence. The law pertaining to the negligence and strict liability is different and you should try to keep the two theories and the law that applies to each theory separate in your mind, to the best of your ability.
For the plaintiffs to recover under the theory of strict liability, the plaintiffs claiming injury need only prove that the product was defective and that the plaintiffs injuries were caused by reason of the defendant (defect).
With regard to strict liability for its products, the manufacturer is deemed to know the defects and vices in the things he makes, whether or not he has actual knowledge of them. A product can be defective and unreasonably dangerous because of the absence of an adequate warning accompanying the product. The maker of a product may be held liable to someone who was injured due to a defect in that product, if that defect renders the product unreasonably dangerous to normal use. An unusual occurrence in and of itself is not proof of a defect....
This is indeed the analysis taken by the Federal District Court for the Eastern District of Louisiana in Schneider v. Eli Lilly and Co., supra, which in our opinion properly sets forth Louisiana law as it applies to lack of sufficient labeling of drug products. It is common knowledge that most drugs carry side effects. What renders the product defective and unduly hazardous is failure of the drug manufacturer to warn of these side effects.
Appellants argue that strict liability should not apply, as they claim they should be fully protected in having labelled the drugs in accordance with the instructions of the FDA. It is true the manufacturer of a drug in 1963 was clearly not required to warn of side effects unless it obtained the prior approval of the FDA. See Code of Federal Regulations, Title 21, § 130.9(a), dicta in Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, at 835, 848 (2nd Cir. 1967). Thus, Bristol-Myers and Upjohn were under no duty to label the drug to warn of tooth discoloration until the FDA approved the labeling. However, the jury, we hold, could reasonably have found that Upjohn was tardy in applying for the warning label. The possibility of side effects in the form of tooth discoloration was known at least as early as 1960. Upjohn made no effort to obtain a warning label. This alone, absent strict liability, could clearly *46 have been found by a reasonable person on the jury to constitute negligence.
Upjohn complains that the testimony of Dr. Joseph O'Neal concerning FDA procedures in labeling exceeded the field of his expertise. However, we do not find in view of the result we have reached that Dr. O'Neal's testimony on this point was essential in reaching a verdict. Furthermore, Dr. O'Neal was permitted to give prescriptions, was a member of the dental faculty of LSU Dental School, and was an expert on the effects of tetracycline. His testimony was thus properly admitted.
Upjohn cites Ducote v. Liberty Mutual Insurance Co., 451 So.2d 1211 (La. App. 4th Cir.1984) in support of its proposition that a proper warning label on a product not inherently dangerous if used properly may absolve the manufacturer of liability. Upjohn contends, therefore, that since they warned of these side effects beginning in 1964, that they should not be liable to Charlene since she took the drug also in 1965 after the warning had taken place. The difficulty with this is that both Charlene and Sonya were prescribed a course of tetracycline in 1963. Only Charlene was prescribed a course in 1965. There was no labeling at all in 1963. It is impossible to determine what harm was caused to Charlene by her 1963 dosage and what additional harm was caused, if any, by the 1965 dosage. Hence the 1965 warning label does not absolve Upjohn of liability.
Two dentists, Dr. Anzalone and Dr. O'Neal recommended placing a crown on the teeth that were discolored (which amounted to all of them) at a cost of $250.00 per crown. These crowns would not last for the plaintiffs' lifetime, but would have to be replaced periodically. The rate of inflation in dental care is approximately 10% per year.[2] Considering the pain involved in crowning the teeth, and the past embarrassment in having discolored teeth, and the pitting of Charlene Miller's teeth, we hold that a verdict of $75,000 in favor of Charlene Miller and a verdict of $65,000 in favor of Sonya Miller was not an abuse of the great discretion awarded to trial court in the award of damages.

NEGLIGENCE OF J. KILLIAN WILLIAMS
As to Mr. Williams' negligence, we reverse the trial court's judgment. In 1963 Williams was a detail man for Upjohn, working in St. Tammany, Tangipahoa, and Washington Parishes. His job, akin to a salesman, also included delivering package inserts and communicating new warnings contained in the inserts to physicians in his territory, which included Drs. Scarle and Newall. Williams was not authorized by Upjohn to make statements in conflict with, or that went beyond those contained in the approved FDA labeling. Mr. Williams played no role in the formation of company policy, and was in no sense responsible for the timing or content of tetracycline package inserts.
The law is settled that if an (officer, agent or) employee of a corporation through his fault injures another to whom he owes a personal duty, whether or not the act culminating in the injury is committed by or for the corporation, the employee is liable personally to the injured third person; it does not matter that liability might attach to the corporation. Article 2315 Civil Code; Canter v. Koehring Company, 283 So.2d 716 (La.1973); Scariano Bros. v. Hammond Const., 428 So.2d 564, at 566 (La.App. 4th Cir.1983); H.B. "Buster" Hughes, Inc. v. Bernard, 318 So.2d 9 at 12 (La.1975); 3 Fletcher Cyclopedia of the Law of Private Corporations, Section *47 1382; Am.Jr.2d, Corporations, Section 1382.
However, the Louisiana Supreme Court, in Canter v. Koehring Company, supra at p. 721 provided the following criteria, that the plaintiff must meet in order to sue an employee individually:
1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage to which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached his duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances-whether such failure be due to misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.
We find that under the Canter criteria and facts sub judice Williams was not negligent. The only personal duty Williams had toward plaintiffs was to deliver and explain the new package inserts to Drs. Newall and Scarle. Williams uncontradicted testimony indicates that he did so. Plaintiffs' inference, that Williams did not deliver and explain the inserts, because Dr. Powley, a practitioner in 1963 and an Upjohn employee since 1978, had testified that during his entire private practice in Kalamazoo, Michigan no detail man from Upjohn ever told him about tetracycline discoloration, is too tenuous to be accepted and without merit.
Plaintiffs contention that Williams knew about tetracycline staining before Upjohn informed him and breached his duty toward plaintiffs, is again without merit. Williams testified (again uncontradicted) that the first he heard about tetracycline staining was from a doctor in New Orleans who asked Williams if he had any knowledge about the relationship between tetracycline and stained teeth (Emphasis added). Williams, not qualified or instructed by Upjohn about the staining answered the Doctor truthfully that he did not know about the relationship. We feel that under the Canter criteria this inquiry did not create a duty towards plaintiffs nor was one ever breached. The judgment against Williams must be reversed.
Accordingly, the judgment of the trial court in favor of plaintiffs and against The Upjohn Company is affirmed, and that against J. Killian Williams reversed, all costs to be borne by The Upjohn Company.
REVERSED IN PART AND AFFIRMED IN PART.
CRAIN, Judge, concurs.
I do not believe a failure to warn of an adverse side effect renders a drug product defective and subjects the manufacturer to strict liability. A product is or is not defective regardless of warning. Defining a defect by a failure to warn confuses the law concerning manufacturers strict liability. This liability attaches regardless of the *48 manufacturer's knowledge of the defect. Weber v. Fidelity & Casualty Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971). If a failure to warn renders the product defective, then lack of knowledge by the manufacturer of that which it is claimed the manufacturer should warn, would logically render the product non-defective. This leads to a necessity of determining the manufacturer's knowledge when applying strict liability where knowledge is imputed. Consequently, negligence analysis is used in strict liability cases and it becomes impossible to reach a different conclusion under principles of negligence and strict liability.
A distinction should be made between a defective product (one which creates an unreasonable risk of injury through normal use, i.e., unreasonably dangerous to normal use) and a product which is not defective in "design, composition or manufacture,"[1] but may, because of the nature of the product, have dangerous propensities. In the latter instance since there is no defect there is no strict liability. However, if the manufacturer knows the dangerous propensities of the non-defective product (i.e., a side effect to the sensitive in drug cases) then the manufacturer has a duty to warn.[2] Failure to do so renders the manufacturer liable on the basis of ordinary negligence, not strict liability. In strict liability cases, i.e., cases where there is a defect, failure to warn should be considered in determining victim fault, not in determining whether there is a defect.
In this case the side effect was so widespread and predictable to all persons to whom the drug was administered during tooth development that a jury could very well find that it was unreasonably dangerous to normal use and thus defective. Then the question becomes not when did the manufacturer have knowledge of the defect because knowledge is presumed, but did the manufacturer warn of the defect in such fashion that use by the plaintiff constitutes victim fault. That question is easily answered in the negative in this case. Where a defective product is on the market for eight years and the warning finally given comes so late that it does not appear in the Physician's Desk Reference[3] prior to the injury, that warning is not sufficient to result in victim fault (assumption of the risk) by the plaintiff absent a showing of actual knowledge of the warning by the prescribing doctor. It is for this reason that I would affirm.
NOTES
[1] The Physician's Desk Reference is a book published annually by Medical Economics, Inc., consisting of monographs summarizing FDA approved drug package inserts.
[2] Upjohn argues that the statement of plaintiffs' counsel in closing arguments that there would be a 10% rate of inflation projected into the future was prejudicial, and that the trial court's failure to admonish the jury to disregard the statement was error. In view of the size of the award, considering the seriousness of the damages sustained and the expensive nature of corrective dental care, we find the error, if there was one, was harmless, and did not affect the jury's verdict, which was a general verdict not divided into individual terms.
[1] Weber, 250 So.2d at 755.
[2] This is actually the basis for the result reached in Hunt v. City Stores, Inc., 387 So.2d 585 (La. 1980).
[3] The record indicates the PDR is the book most doctors refer to for warning with reference to drug use.