520 So.2d 1276 (1988)
9 TO 5 FASHIONS, INC.
v.
Petr L. SPURNEY, Individually and as an Officer and Employee of the 1984 Louisiana World Exposition, and ABC Insurance Company.
No. 87-CA-343.
Court of Appeal of Louisiana, Fifth Circuit.
February 8, 1988.
Rehearing Denied March 17, 1988.
Writs Granted May 13, 1988.
*1277 Peter J. Castano, New Orleans, for plaintiff-appellee 9 to 5 Fashions, Inc.
Eugene R. Preaus, Robert B. McNeal, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for defendant-appellant Petr L. Spurney.
Ernest L. O'Bannon, John E. McAuliffe, Jr., New Orleans, for defendant-appellant Western World Ins. Co.
Before KLIEBERT, BOWES and DUFRESNE, JJ.
KLIEBERT, Judge.
This action in tort was brought by 9 to 5 Fashions, Inc., the uniform supplier to the Louisiana World Exposition, Inc. (LWE), against Petr L. Spurney, the former president and chief executive officer of LWE, and Western World Insurance Company, the directors and officers liability and company reimbursement insurer of LWE, for the recovery of damages sustained by means of the alleged nonfeasance, misfeasance and/or fraudulent acts of Spurney in relation to the uniform contract. Judgment was rendered in favor of 9 to 5 Fashions for $101,438.00 plus legal interest from date of judicial demand and costs. Spurney and Western World brought this appeal. For the reasons which follow we amend the judgment to reduce the amount of the award to $45,303.00 plus contractual and judicial interest computed in the manner hereinafter shown, and, as thus amended, affirm the judgment.
Plaintiff originally filed a notice-type petition in response to which defendants filed a motion for judgment on the pleadings. *1278 The motion was granted and the plaintiff given fifteen (15) days to file an amended petition. In its amended petition plaintiff set forth specific facts and incidents to support its contentions that Petr L. Spurney, through his personal negligent nonfeasance, breached duties he owed to plaintiff arising from his role as principal for the Exposition in this contractual transaction, in the following particulars:
i. In causing plaintiff to purchase excess fabric after members of his staff had previously selected another fabric, which plaintiff had, in accordance with its contract made into uniforms;
ii. In failing to provide any continuity or supervision over the business dealings with plaintiff by continually changing the personnel in charge of the uniforms which caused 9 TO 5 FASHIONS, INC., to purchase excess fabric at the direction of THE 1984 LOUISIANA WORLD EXPOSITION:
iii. In failing to substantiate the correctness of the billing for the excess fabric to the financial committee when he knew, or should have known, that members of his staff measured and accounted for all excess fabric purchased by plaintiff at the direction of THE 1984 LOUISIANA WORLD EXPOSITION;
iv. In failing to properly ascertain the uniform needs and, therefore, ordering in excess to the detriment of 9 TO 5 FASHIONS, INC.;
v. In continuing to place unnecessary uniform orders with plaintiff after he knew or should have known that the Exposition would not be able to fulfill its contractual obligations on its contract with plaintiff;
vi. In failing to warn plaintiff of the Exposition's inability to meet its contractual obligations with plaintiff when he knew of the Exposition's financial difficulties;
vii. In failing to return the extra and unused uniforms to plaintiff when he knew the Exposition would not be able to fulfill its contractual obligations, preventing plaintiff from mitigating its losses;
viii. Any and all other acts of personal negligence nonfeasance or malfeasance which may be proved at trial.
b. In the alternative, plaintiff alleges that defendant, PETR L. SPURNEY, through deliberately misleading representations, perpetrated fraud upon plaintiff in the following particulars:
i. By giving verbal and contractual assurances regarding the excess fabric, deliberately calculated to induce plaintiff to purchase unnecessary fabric, to plaintiff's financial detriment;
ii. By deliberately changing uniform style and fabric orders after plaintiff had begun uniform construction, causing plaintiff to purchase unnecessary excess fabric to its financial detriment;
iii. By continuing to place unnecessary uniform orders after defendant knew that said uniforms would not be paid for, deliberately forcing plaintiff into a position of financial vunerabilty.
Defendants denied all allegations of the amended petition except to admit that (1) a uniform contract existed between LWE and 9 to 5 Fashions; (2) Marlin Manufacturing had previously been awarded the contract, and (3) Western World had in effect a Directors and Officers Liability Policy which covered Spurney. Trial of the case was prolonged, the exhibits numerous, and the witnesses many. At its conclusion judgment was rendered against Spurney and Western World with accompanying reasons which provided in part:
"There was a relationship between Spurney and 9 to 5 which gave rise to personal duties on behalf of Spurney, the breach of which, through nonfeasance, malfeasance, or intentional misrepresentation renders him personally liable.

* * * * * * *1279 As a direct result of Spurney's breach of his individual obligations to plaintiff 9 to 5, the following damages are found to be compensable:

ITEM OF DAMAGES AMOUNT
1. Fabric loss (invoice # 67) $ 32,599.00
2. Fabric loss (invoice # 73) 32,709.00
3. Expenses incurred to expedite
 the uniform program 45,000.00
4. Interest due (10% per annum) 11,130.00
 $ 121,438.00
5. Less credit for sale of excess
 fabric - 20,000.00
 TOTAL DAMAGES $ 101,438.00

* * * * * *
Western World Insurance Company, Inc. is responsible for the malfeasance, non-feasance and intentional misrepresentations of Spurney under its policy. The exclusions in the policy do no [not] relate to the causes of action found herein. Therefore, Judgment is rendered herein in favor of 9 to 5 and against Western World Insurance Company, Inc."
On appeal defendants contend the trial court erred in finding that Spurney: (1) owed a duty to 9 to 5 in the discharge of his corporate responsibilities, (2) breached a duty owed to 9 to 5, and (3) caused damage to 9 to 5 by breaching a duty owed. Defendants also contend the trial court erred (1) in awarding out-of-pocket expenses, (2) in setting the amount of out-of-pocket expenses, (3) in awarding judicial interest on contractual interest, and (4) in failing to find that 9 to 5 was contributorily negligent.

FACTS
In September of 1980 Petr L. Spurney was hired as the executive vice-president and general manager of the Louisiana World Exposition (LWE). He was promoted to chief executive officer in 1983 and acted in that capacity until the project's completion in January of 1985. The corporate structure of LWE included a 200 member board of directors, which met annually; an executive committee which met monthly to deal with major items such as appointments to subcommittees; a management committee which met weekly to award contracts, set budgets, hire officers and perform management functions; a concessions committee which handled the award of concessions contracts and controversial matters on an expedited basis; and the chief executive officer and the hierarchy of vice-presidents, directors, etc. ... Spurney was chairman of the management committee and a member of the concessions committee as well as the CEO of LWE.
Items filtered up to the officers and directors of different departments such as Tourism, Marketing, Operations, Finance, etc ... and were submitted to Spurney for placement on the agenda of the Management Committee. If the Management Committee approved the award of a contract the matter was referred to the legal department for the details to be hammered out. The contract was then executed by Spurney and assigned to the appropriate division for administration. Management Committee decisions were made by consensus rather than majority rule.
Cynthia Houser was a marketing division manager responsible for securing "Official Suppliers" to LWE. The concept behind the official supplier program was to secure products and services at little or no cost to LWE in exchange for the supplier's use of LWE logos, marketing and advertising rights, i.e., a quid pro quo. Official suppliers became members of the "Official Family" and received perks such as membership in the VIP Club, preferred parking, tickets at special group rates, and "Your" day at the Fair. Once an official supplier was selected and a contract executed, the contract was assigned to the operations division for administration. Houser did not administer contracts unless specially assigned.
The fair was scheduled to open in May of 1984. In February of 1983 Houser and Bob Whitney, the Art Director of LWE, met with various uniform companies and requested that those interested in becoming an "Official Supplier" submit preliminary designs and fabrics depicting the overall LWE image and detailed designs *1280 for host and hostess uniforms. LWE wished to utilize a custom design as opposed to an off-the-shelf uniform. Custom design of a uniform is a drawn out process requiring preliminary sketches, patterns, sample fabrics, dyeing grey goods, etc ..., whereas an off-the-shelf program utilizes stock goods. The requirements were originally projected at 15,000 uniforms in 15 categories. Houser estimated that ten to twelve months working time was necessary to "accomplish our look."
Six companies participated in the interview process, but the only companies willing to offer significant financial considerations to LWE for being designated as the official supplier were Marlin Manufacturing Company and 9 to 5 Fashions. Both companies submitted preliminary proposals in April of 1983. Unit prices were not submitted because prices would vary greatly depending on the fabric, design and number of uniforms. On April 29, 1983 Houser, Whitney and other staff members met with Spurney and recommended that Marlin be appointed the official supplier based on the designs, reputability, workmanship and past performance. A proposal prepared by the staff was sent to the management committee for review.
On May 4, 1983 action on the uniform contract was deferred by the management committee pending the receipt of further information. Negotiations by Spurney's staff with 9 to 5 Fashions and Marlin Manufacturing continued. Both companies were required to submit amended proposals with firm prices per unit, despite the fact that the design specifications were not finalized. Marlin Manufacturing's proposal contained an "Estimated Price List" utilizing the "OOOA Standard" OOOA is an acronym for "out of our ass", i.e., a wild guess. Nevertheless, Houser informed 9 to 5 Fashions that the bids had to be "firm" and expressed concern that 9 to 5 Fashions' bid was "very high" when compared to Marlin's. At a July 6, 1983 meeting the management committee unanimously moved that the LWE staff obtain bids from Marlin Manufacturing and 9 to 5 on specific uniforms with identical bid requirements. The management committee subsequently referred the uniform proposals to the concessions committee for review and a recommendation. The bid specifications were sent to the competing companies on August 18, 1983 with bids to be submitted by September 1, 1983.
Marlin Manufacturing Company resubmitted its original proposal utilizing prices estimated on the OOOA standard. In a letter dated September 2, 1983 Spurney advised the chairman of the concessions committee that the LWE staff would recommend Marlin Manufacturing based on their "price quote" which was $139,626 less than 9 to 5 Fashions'. However, 9 to 5 Fashions had been granted an extension of time and had yet to submit its proposal, and when it was submitted on September 6, 1983, it was in the form of a joint proposal between 9 to 5 Fashions and Marlin Manufacturing. By letter dated September 9, 1983, Leo Hymam, the president of Marlin Manufacturing, informed Houser that the previous bids were withdrawn and Marlin Manufacturing would work on a consultant level with 9 to 5 Fashions.
Prior to the concessions committee meeting on September 27, 1983 Houser called Hyman. According to her testimony, he led her to believe he would accept the contract under its previous bids. Accordingly, notwithstanding Hyman's letter of September 9, 1983, the LWE staff recommended that Marlin Manufacturing be awarded the uniform contract, and the concessions committee accepted the recommendation. When told Marlin Manufacturing had been awarded the contract, Hyman informed Houser via telegram that a binding contractual agreement existed between 9 to 5 Fashions and Marlin Manufacturing which precluded Marlin Manufacturing from accepting the contract.
On October 12, 1983, 9 to 5 Fashions filed lawsuits in state and federal courts against Houser, Hyman and LWE alleging restraint of trade. At the request of the management committee Spurney and LWE counsel Ann Brown met with Kim Seybert, the president of 9 to 5 Fashions, and Wendell Gauthier, the owner and general counsel, *1281 on October 21, 1983. It was agreed that if 9 to 5 Fashions dismissed its suits, Spurney would recommend the approval of 9 to 5 Fashions as the official uniform supplier. Subsequently by letter Spurney added the following requirements:
(1) Marlin Manufacturing was used as a consultant,
(2) Marlin Manufacturing's designs were utilized,
(3) The price quote was lowered,
(4) A performance bond in the amount of $750,000.00 was supplied.
Immediately after the meeting, Spurney informed Houser he was concerned about awarding 9 to 5 Fashions the uniform contract, even with Marlin Manufacturing acting as a consultant, and requested that Houser bring him the files compiled on the other uniform companies. At a staff meeting on November 7, 1983 Spurney again announced he was not happy with 9 to 5 Fashions, but after a general discussion conceded that the possibility of another lawsuit and political complications made backing out impossible. On November 16, 1983 Spurney presented the terms of negotiations with 9 to 5 Fashions to the management committee. A motion to enter into a contract with 9 to 5 Fashions carried unanimously. Although ten to twelve months had been originally estimated as the length of time necessary to produce the designed uniforms, the remaining time to the fair's opening was now only six months.
After 9 to 5 Fashions was approved by the management committee as the official supplier, details had to be worked out for the contract. Negotiations were protracted and an official contract was not signed until May 8, 1984, a few days prior to the fair's opening. Because time for ordering grey goods was running short, 9 to 5 Fashions needed immediate information on uniform numbers, material selections, and designs. 9 to 5 Fashions experienced difficulty in obtaining this information as Bob Whitney was frequently out of town attending to other fair-related duties, and John Whitney had, at his own and Spurney's suggestion, removed himself from contact with Marlin Manufacturing. Usual practice born out of necessity would have been to appoint a director to coordinate efforts with the official supplier. Although 9 to 5 Fashions had been designated as the official supplier, no director was appointed at that time. On December 14, 1983, Seybert, 9 to 5 Fashions' president, met with Bob and John Whitney regarding the projected number of uniforms. Bob Whitney provided Seybert with a spread sheet setting forth the number of uniforms and types needed by LWE. 9 to 5 Fashions ordered fabric based on the numbers submitted by Whitney and on Whitney's approval. However, neither Whitney nor any other LWE representative had been given the authority to authorize fabric purchases.
On February 6, 1984, at Spurney's request, 9 to 5 Fashions put on a show of prototype uniforms. Various changes were made in uniform accessories and trim, and the monorail uniforms were redesigned. Since the designation as official supplier was an open end contract, Spurney finally appointed Mary-Kate Tews director of the Uniform Program. In a memo written at the time of her appointment, Tews noted that the project "is going to be a tough one to pull off in just 94 days" (the time to fair opening). Tews promptly submitted new numbers on the uniform contract. 9 to 5 Fashions was concerned because the material had been ordered on the basis of the original numbers. The contract ultimately signed included a clause that LWE was responsible for all excess fabric.
LWE submitted purchase orders for the uniforms, and 9 to 5 Fashions filled the orders and shipped the uniforms along with invoices. Although there was some confusion in the first order because 9 to 5 Fashions' invoices did not match specific purchase order numbers, the kinks in the system were worked out. On opening day all employees were uniformed.
9 to 5 Fashions' invoiced LWE for $114,834.94 in excess fabric and notions on June 21, 1984, with supplemental information to be submitted on request. On July 11, 1983 LWE employees visited the locations where *1282 the fabric was being stored for verification of the measurement and discovered 9 to 5 Fashions had overbilled LWE approximately $24,000.00. Meanwhile, due to the shortage of funds, the fiscal and finance committee assumed control of LWE's financial affairs and established a ranking system for creditors. Category 1 creditors, in which 9 to 5 Fashions fell, were paid before all other creditors. In August of 1984 John Whitney met with 9 to 5 Fashions to resolve the excess fabric claim. Whitney approved for payment only one-half of the $64,000.00 claim, having concluded that mistakes by 9 to 5 Fashions when calculating fabric needs caused some of the overage. LWE refused to authorize payment of any of the claim until 9 to 5 Fashions mitigated its losses by selling the fabric. Due to the insolvency of LWE, the invoices were never paid. 9 to 5 Fashions sold most of the excess fabric for $20,000.00.

THE LAW
Defendants devote a substantial portion of their briefs to citing cases and statutes in support of the proposition that corporate officers owe a fiduciary duty only to the corporation and are not personally liable for corporate debts to third persons with whom they deal on behalf of the corporation. While consistent with defendants' efforts to characterize this action as one to collect a corporate debt from the personal estate of a corporate officer, such an approach skirts the real issue raised by plaintiff, i.e., whether Spurney's actions constituted a tort recognizable under the provisions of Civil Code Articles 2315 and 2316.
If an officer or agent of a corporation through his fault injures another to whom he owes a personal duty, whether or not the act culminating in the injury is committed by or for the corporation, the officer or agent is liable personally to the injured third party, and it does not matter that liability might also attach to the corporation. La.C.C. Article 2315; H.B. "Buster" Hughes, Inc. v. Bernard, 318 So.2d 9 (La.1975); Canter v. Koehring Company, 283 So.2d 716 (La.1973); Miller v. Upjohn Co., 465 So.2d 42 (1st Cir.1985) writ denied 467 So.2d 533. In Canter, supra at 721 the supreme court adopted the following analysis for use in determining whether personal liability exists:
"... Most of the decisions concern situations where the employer's duty to furnish a safe place to work, La.R.S. 23:13, is alleged to have been breached, and an employee seeks to hold individually liable for damages thereby sustained some corporate officer, agent, supervisor, or co-employee alleged to be at fault. The generic issue is the same, however, as to the breach of any duty imposed by the employer upon its officer, agent, or employee:

Under what circumstances is the latter individually liable to a third person damaged solely by reason of the individual's breach of the employment-imposed duty?
Adams and its progeny have established the following criteria for imposing individual liability, which are generally applied by the First and Fourth Circuits and by some panels of the Second and Third:
1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.

4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed *1283 upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.6
* * * * * *
We specifically approve the rationale of these decisions. We think they are in accord with the basic principles of tort law and of our jurisprudence.
We disapprove the conflicting Maxey line of decisions, insofar as they appear to hold that the duties imposed under an employment or agency relationship are exclusively owed to the employer or principal and are irrelevant in determining whether a legal duty is owed to a third person by the officer, agent, or employee.
* * * * * *
To the contrary, as noted in part I above, the duty may be imposed upon the defendant solely because of the employment or agency relationship, but its breach may nevertheless make him individually liable for harm thereby sustained by a third person (including a co-employee):
The failure to act as required by the employment duty may deprive the third person of a protection owed him by the principal or employer, and such risk of harm because of the breach may have been reasonably foreseeable. Thus, the breach of the duty imposed by the employment or agency relationship may, under general tort principles, be actionable negligence because of the creation or maintenance thereby of an undue risk of harm to others." (Footnote omitted; emphasis supplied)
See also Scariano Bros. v. Hammond Const., 428 So.2d 564 (4 Cir.1983).
As stated by the supreme court in Devoke v. Yazoo & M.V.R. Co., 211 La. 729, 30 So.2d 816, 819 (1947), "every business, however lawful, must be conducted with due regard for the rights of others..." Thus, a corporation has a duty to exercise due care in its relationship with third parties, and the same acts or omissions may constitute breaches of both general duties and contractual duties giving rise to actions in both tort and contract. See Federal Insurance Company v. Insurance Company of North America, 262 La. 509, 263 So.2d 871 (1972); Franklin v. Able Moving & Storage Co., Inc., 439 So.2d 489 (1st Cir.1983). When the duty to exercise due care is breached by an officer or agent to whom the duty is delegated, and a third person is injured thereby, personal liability attaches, regardless of whether the breach was accomplished through malfeasance, misfeasance or nonfeasance. Canter v. Koehring, supra. See also Fryar v. Westside Habilitation Center, 479 So.2d 883 (La.1985).
We have carefully reviewed the documentary evidence and the testimony contained in the record before us. Although some of the allegations of the petition were not proven and some of the evidence introduced was conflicting or contradictory, the evidence before the trial court, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for its conclusion that Spurney breached a personal duty owed 9 to 5 Fashions and through the breach caused the complained-of injury.
Spurney had the same duty to exercise due care in his relationship with third parties as does corporations and individuals. Further, LWE delegated to Spurney the responsibility of securing and administering the contract with 9 to 5 Fashions. With the delegation of authority went the responsibility or duty to act with due care. That duty was heightened in the present case because the contract was an open end contract, i.e. it was not just a contract to *1284 furnish a specific uniform, at a specific price, for a specific day.
Rather, uniform suppliers were competing to determine which would be designated "official supplier." Each submitted proposals as to design, material, price and inducements or perks it would supply or give to LWE. LWE could change the design, the material and the number of uniforms at any time. Thus, the uniform supplier was placed in a precarious position financially and contractually with its destiny in the control of LWE officials. Accordingly, it was necessary that LWE personnel closely and timely coordinate efforts with the uniform suppliers in order to avoid costly misunderstandings and/or delays.
The record reflects Spurney and his staff strongly favored Marlin Manufacturing as the official supplier but were unable to muster the necessary support from the management committee. The stated basis for the choice, i.e., better price, was shown to be nonexistant in light of the "O.O.O.A." standard, although Marlin Manufacturing did have greater experience. 9 to 5 Fashions solved the experience problem by teaming up with Marlin Manufacturing and securing permission to use its designs. Notwithstanding notice of the agreement Spurney and his staff recommended the contract as official uniform supplier be awarded to Marlin. Further, after Spurney agreed to recommend 9 to 5 Fashions to the management committee, he continually expressed his displeasure with the choice and directed his staff to find out the latest date an alternative supplier could step in and uniform LWE employees in time for opening day.
Although Spurney recognized the need for an LWE employee to act as uniform director in November of 1983, he did not appoint a director until February of 1984, only three months before the fair was scheduled to open.
The director was appointed immediately after the fashion show, at which time, according to Seybert, Spurney learned that the material had been ordered. In the interim between their appointment and the show 9 to 5 Fashions was unable to secure guidance from LWE in developing the uniform program. The LWE employees with whom they had contact had other duties and were frequently unavailable. When deposed all of these LWE employees denied having the authority to administer the uniform contract. This inability to communicate with LWE resulted in delays in designing and manufacturing the uniforms and misunderstandings as to the number of uniforms which would be ordered. Both of these factors played a role in the over-order of fabric and notions.
The trial judge, after considering the totality of the circumstances in the light of his credibility evaluations, concluded that Spurney was carrying out a personal vendetta against 9 to 5 Fashions, during the course of which Spurney breached duties owed 9 to 5 Fashions both by Spurney individually and by LWE. The trial court also concluded that as a direct result of the breach 9 to 5 Fashions lost $45,308.00 ($65,308.00$20,000.00 credit) on excess fabric and notions. As we view the record this finding is not clearly wrong; hence, we cannot disturb it. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979).

OUT OF POCKET EXPENSES
Spurney and Western World contend the trial court's admission of evidence as to an award of $45,000.00 in out-of-pocket expenses was error because these damages (1) went beyond the scope of the pleadings, (2) were uncorroborated by other evidence, and (3) were unsupported by the evidence offered. Because we find merit in the third contention, it is unnecessary for us to address the first and second ones.
Seybert explained that the out-of-pocket expenses represented the difference between what 9 to 5 Fashions was paid by LWE as contrasted with the expense incurred by 9 to 5 Fashions in fulfilling the contract. Seybert proceeded to break the expenses into six categories as follows:

 Category 1  $163,000.00
 Category 2  $156,000.00
 Category 3  $136,000.00
 Category 4  $ 4,000.00
 Category 5  $120,000.00
 Category 6  $ 37,000.00
 ___________
 Total $616,000.00

*1285 Against these expenses are credits for payments from LWE in the amount of $605,172.95 and $20,000.00 from the sale of the excess fabric. Thus, the evidence introduced at trial established the following:

 Payments LWE $605,172.95
 + Sale of Fabric 20,000.00
 ___________
 Total Income $625,172.95
 - Expenses 616,000.00
 ___________
 Net Profit $ 9,172.95

The award for out-of-pocket expenses was based on erroneous calculations of the income and expenses associated with the uniform contract. Consideration of the correct calculations as reflected by the evidence adduced at trial reveals that 9 to 5 Fashions did not suffer out-of-pocket expenses. Accordingly, that portion of the judgment which awards plaintiff $45,000.00 in out-of-pocket expenses is reversed and set aside due to lack of proof.

INTEREST ON INTEREST
In its reasons for judgment the trial court explained that contractual interest at an annual rate of 10%, totaling $11,130.00, was an element of the total award. The court awarded judicial interest on the total award from date of judicial demand. Defendants contend the court in effect awarded interest on interest, in contravention of La.C.C. art. 2001, which provides:
"Interest on accrued interest may be recovered as damages only when it is added to the principal by a new agreement of the parties made after the interest has accrued."
As plaintiff has neither alleged nor shown that the parties agreed accrued interest would be added to the principal sum due for excess fabric, any award of legal interest on the contractual interest is erroneous. La.C.C. art. 2001; Williams v. Bank of La. in New Orleans, 454 So.2d 1138 (4th Cir.1984) writ denied 460 So.2d 611. See also Seals v. Morris, 465 So.2d 140 (1st Cir.1985).
The trial judge did not delineate the period for which he was awarding 10% contractual interest. Hence, we are unable to discern whether legal interest was awarded on contractual interest. However, we note from the record that at some point in time 9 to 5 Fashions received $20,000.00 from the sale of excess fabric. Contractual interest on the proceeds should have terminated on the date of the sale. We cannot from the record discern the date of the sale. Further, it appears from the reasons for judgment that contractual interest was awarded on an element of damages which we have disallowed, i.e., the $45,000.00 claim for out-of-pocket expenses. If such is the case, the interest award must be proportionately reduced.
Accordingly, we amend the judgment to award interest as follows:
(1) 10% on the entire excess fabric claim ($65,308.00) from the date interest began to accrue until the date the fabric was sold or the date of judicial demand, whichever came first;
(2) If the fabric was sold before judicial demand was made, 10% on the remaining fabric claim ($45,308.00) from the date of the sale until judicial demand, and legal interest thereafter;
(3) If the fabric was sold after judicial demand was made, legal interest on $65,308.00 from date of judicial demand until the fabric was sold, and legal interest on the remaining balance of $45,308.00 from the date of the sale until balance is paid.
The case is remanded to the trial court. In the event the parties are unable to agree on the amount of the interest due utilizing this formula, then the trial court is instructed to hold an evidentiary hearing to obtain the date on which the excess fabric was sold and other information as may be necessary to compute the amount of the contractual interest and judicial interest in the manner above stated.

THE CONTRIBUTORY NEGLIGENCE OF 9 TO 5
Defendants contend the trial court erred in failing to rule upon whether 9 to 5 Fashions was barred from recovering against Spurney because of its contributory negligence. In an amended answer *1286 Spurney contended 9 to 5 Fashions was contributorily negligent in failing to submit accurate invoices to LWE, in failing to submit invoices that matched LWE purchase orders, and in failing to submit a statement of amounts due to the fiscal and financial committee of LWE.
Neither the judgment nor the supporting reasons reflect that the trial court addressed the issue of contributory negligence. Where a judgment is silent as to a matter placed at issue, it is presumed the trial court denied the relief sought. Hatcher v. State, thru Dept. of Transportation and Development, 478 So.2d 774 (3rd Cir. 1985) writ denied 479 So.2d 923; Debs v. Sunrise Homes, Inc., 430 So.2d 110 (5th Cir.1983) writ denied 437 So.2d 1153.
Contributory negligence is an affirmative defense which must be proven by the party alleging it. La.C.C.P. art. 1005; Guillot v. Fisherman's Paradise, Inc., 437 So.2d 840 (La.1983). The defendants did not bear their burden of proving contributory negligence on the part of the plaintiff. Defendants did not show that the original problems with the billing procedures affected or contributed to the damages sustained by plaintiff, and defendants failed to introduce evidence as to means of redress plaintiff might have had before the fiscal and finance committee and whether plaintiff pursued those avenues of relief.

THE LIABILITY OF WESTERN WORLD INSURANCE COMPANY
Western World's policy of insurance to LWE provided in part:
"A) DIRECTORS AND OFFICERS LIABILITY
The Insurer shall pay on behalf of the Directors and Officers (hereinafter called the Insured) Loss arising from any claim or claims made against the Insureds jointly or severally, during the Policy Period by reason of any Wrongful Act (as hereinafter defined) committed, attempted or allegedly committed or attempted by the Insureds.
* * * * * *
(c) The term `LOSS' shall mean any amount which the Directors and Officers are legally obligated to pay or for which the Company is required to Indemnify the Directors or Officers or for which the Company has to the extent permitted by law, indemnified the Directors and Officers for claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgments, settlements, costs (exclusive of salaries of officers or employees), and defense of legal actions, claims or proceedings and appeals therefrom and costs of attachments or similar bonds provided however that Loss shall not include fines or penalties imposed by law or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.
(d) The term `Wrongful Act' shall mean any actual or alleged error, misstatement, misleading statement, act or omission or neglect or breach of duty by the Directors or Officers in the discharge of their duties in their capacity as Directors or Officers of the Company, individually, collectively, or any matter claimed against them by reason of their being Directors or Officers of the Company."
We have already concluded that Spurney, both individually and in his capacity as an officer of LWE, breached duties owed to 9 to 5 Fashions. These breaches were "wrongful acts" as contemplated by the Western World policy. Accordingly, the trial judge correctly cast Western World in judgment in solido with Spurney.

CONCLUSION
In recapitulation, the judgment of the trial court is amended to reduce the principal award to $45,308.00 and to award contractual and judicial interest in the amount computed by utilizing the formulae hereinabove provided. In all other respects, the judgment is affirmed and the case remanded to the trial court. Each party is to bear his own cost of the appeal.
*1287 AFFIRMED IN PART, AMENDED IN PART, AND REMANDED.
BOWES, J., dissents with written reasons.
BOWES, Judge, dissenting.
With all due respect to the opinion of my learned colleagues composing the majority of this court, I find that I must vigorously dissent from their findings that Petr Spurney was either personally, or in his capacity as president of LWE, responsible or liable in any way to 9 to 5 Fashions, Inc. regarding their contract with LWE. I also disagree with their holding that Western World Insurance Company (hereafter Western World) is liable in this matter (in any capacity).
The trial court found that Spurney had a personal duty or duties toward the plaintiff which he breached, and held Western World liable for his actions because, he stated, that "the exclusions of their policy do not relate to the causes of action found herein." Now, the majority of this court, in their opinion, holds that the trial court was not clearly wrong in its conclusions that Spurney breached duties owed to 9 to 5, both individually and in his capacity as an officer of LWE, and that Western World is liable for his "wrongful acts."
The crux of the issue, and the one on which this case turns, in my opinion, is the failure of the plaintiff, the trial court, and now this appellate court, to give specific and exact substance to the duties they contend were owed by Spurney, personally or otherwise, to this particular contractor (9 to 5). Rather, like Banquo's ghost in Shakespeare's hallowed "Macbeth," the accusation floats in thin air without material form or final destination.
Although both courts seem to use all the correct legal phraseology to hold Spurney personally liable and give some examples of his action or inaction, in my view, both fail to show in what way, or for what reasons these constituted personal duties of Spurney to 9 to 5other than the bald statement that this was so. Additionally, I find no jurisprudence or cases with similar facts quoted to justify their statements.
The vague and general reasons of the trial court for holding Spurney personally liable are best demonstrated on pages 4 and 5 (R. 291) of the trial judge's reasons for judgment:
"Spurney personally obligated himself to 9 to 5 to provide general cooperation, assistance and to perform specific acts. A corporate officer, who personally and individually assumes obligations to someone, has a duty to perform those obligations like everyone else. Spurney undertook a responsibility to do certain things for 9 to 5. There was a relationship between Spurney and 9 to 5 which gave rise to personal duties on behalf of Spurney, the breach of which, through nonfeasance, malfeasance, or intentional misrepresentation renders him personally liable."
Originally designated as writer of this opinion, I have laboriously searched through the record in great detail and can find no evidence of such duties owed by Spurney or breached by him. Whatever they were supposed to be, they have never been delineated with specificity but the trial judge finally concluded that they were the result of a "personal vendetta" that Spurney was carrying on against 9 to 5, though he gives no rhyme or reason why Spurney should do this to one of hundreds of contractors; and the majority concludes that the trial judge was not clearly wrong.
The "Reasons for Judgment" strongly indicate to me that the trial court simply ignored salient facts which did not complement its conclusion. To a lesser extent, in my opinion, the majority of this court has not considered certain undisputed and significant evidence in its affirmation of the district court's conclusion regarding Spurney's personal liability.
For example, Marlin was a highly experienced and reputable company which had uniformed the Knoxville World's Fair and with whom John Whitney (of LWE) had previously worked closely and whom Whitney enthusiastically endorsed. Also, 9 to 5 was a brand new company with no track record and little to recommend it except for *1288 the large number of endorsements from political figures around the state (which the trial court admitted was not resented by Spurney).
The "O.O.O.A." standard referred to by the majority as being employed by Marlin was defined, not as "a wild guess", but as a coded method by which the manufacturer (Marlin) was able to reserve flexibility to enable it to change its prices, because of pressures of time, change in fabric, fabric color, etc. The bid of 9 to 5 contained very similar reservations: "Prices ... may vary according to fabric, style, or quantity changes. Prices are also based on a delivery date of 210 days from placement of order." Furthermore, Spurney testified emphatically, and without contradiction, that he and the committee were not aware in the beginning of the meaning of the term "O.O.O.A." When Spurney became so aware, he required Houser to confirm Marlin's prices as firm before he continued to consider them. Therefore, in my view, the significance placed upon the O.O.O.A. standard by the majority is really a "red herring" and is lost upon me as logical reasoning.
Similarly, the "joint" proposal submitted on September 6th was submitted and signed only by Kim Seybert, president of 9 to 5, without confirmation from Marlin until September 9th. Marlin then confirmed, via its president, Leo Hyman, that its individual bid was still viable. Based on that reassurance, the marketing staff recommended Marlin. As I see it, the majority's phraseology that "notwithstanding Hyman's letter ... the LWE staff recommended Marlin" is not accurate, deceptive, and reminiscent of that portion of the trial court's reasons dealing with this subject. The trial judge said:
"In August 1983, 9 to 5 and Marlin worked out their differences and agreed that Marlin would serve as a consultant to 9 to 5 and that 9 to 5 would be the sole bidder. This agreement was reduced to writing and Marlin notified LWE of its withdrawal from the bidding. Thereafter, on September 27, 1983, Spurney recommended to the Concessions Committee that Marlin be awarded the uniform supply contract."
Such "findings" on the part of the trial judge manufacture a factual situation which may justify his conclusions and the majority's affirmation but are not borne out by the evidence in my opinion.
I find the following excerpt from the official minutes of the concession committee on September 27, 1983 to be interesting and pertinent at this point:
"9 to 5 called Marlin Manufacturing, stated they had been assured they would get the bid for the uniforms and asked Marlin to come in as a consultant. Marlin agreed. When Ms. Houser called Marlin to reaffirm that if 9 to 5 did not get the bid would their original bid be good, they said yes.
LWE called 9 to 5 and stated their price range was too high. In return, 9 to 5 sent a letter saying they would lower the prices after the contract was signed.

Mr. Edward Stagg moved, Mr. Charles Teamer seconded that subject to the written verification of their bid, the Louisiana World Exposition award the bid for uniforms to Marlin Manufacturing. The Concession Committee voted approval. Representative John Alario abstained from voting." [Emphasis supplied]
Putting aside the question of these premature assurances by 9 to 5, in passing, it appears to this writer that sound business practitioners would cast a wary eye toward the company who asserts it will lower the bid after the contract is signed.
I find it hardly surprising that, following the October lawsuits filed by 9 to 5 after the concessions committee had recommended approval of Marlin to the management committee, Spurney expressed concern over awarding the contract to 9 to 5 and made inquiries as to the availability of other contractors"just in case" the fledgling 9 to 5 did not perform properly. While the inquiries themselves certainly did not have a deleterious effect on 9 to 5, the trial court and my esteemed brothers of the majority on this court seem to have read into these expressed doubts some "personal" *1289 animosity on the part of Spurney toward 9 to 5.
In my view, this action was nothing more than justifiable sound business planning and an attempt to save the program should the conditions, which had been discussed at the October meeting but which had yet to be agreed upon or reduced to a contract, not be met by 9 to 5.
The trial court found that Spurney placed no LWE employee in charge of the uniform program until February 6, 1984 "despite numerous requests by 9 to 5" and that he should have done so sooner "because it was needed for this formative time." My review of this case reveals that this is simply inaccurate, with no support in the record, as some representative of LWE, although not designated especially as such, was, in fact, at all times, coordinating the uniforms contract; and I can find no evidence of 9 to 5 ever requesting such an appointment.
My esteemed brothers of the majority find that prior to Ms. Tews' appointment, 9 to 5 was unable to secure guidance from LWE in developing the uniform program and this inability to communicate with LWE resulted in delays in designing and manufacturing the uniforms and misunderstandings as to the number of uniforms which would be ordered. They also find that both of these factors played a substantial role in the over-order of fabric and notions. The majority also notes that Bob Whitney provided Seybert with a sheet setting forth the number of uniforms needed by LWE, and that 9 to 5 ordered fabric based on these specifications. Yet, they say, neither Whitney nor any other LWE employee had authority to authorize fabric purchases. What has been omitted by both courts is the fact that despite the lack of a single coordinator, LWE did authorize fabric purchases for 9 to 5 as early as December, 1983, and thereafter. It is apparent to me that the lack of a designated director, named as such, in this instance is irrelevant, and resulted in no harm or delays to 9 to 5.
Perhaps more importantly, nowhere in the majority opinion do I find reference to the terms of the contract between LWE and 9 to 5 which provided for payment to 9 to 5 for any excess fabric ordered as a result of incorrect figures provided by LWE prior to Ms. Tews' appointment. How fair can one be?
The contract further provided that 9 to 5 mitigate its losses by attempting to sell the excess fabric. The testimony revealed that it was John Whitney's conclusion (after an investigation of the facts) that approximately one-half of the claimed excess fabric expense was for fabric ordered as a result of miscalculations made by 9 to 5, not by LWE. 9 to 5 invoiced LWE for excess fabric for the first time in June, 1984. In July, the Fiscal and Finance Committee assumed complete financial control of LWE, as it was almost out of funds, and they gave 9 to 5 preferred payment status as a Category one (1) vendor.
Between the June invoice and July, LWE attempted to inventory the fabric, in accordance with its contract with 9 to 5, to determine the amount actually owed. In August, there were ongoing attempts to reconcile the invoices for uniforms and excess fabric. After July, only the Fiscal and Finance Committee could approve payments. As the majority notes, the (last few) invoices were never paid due to the insolvency of LWE, and not because of a refusal by Spurney or caused by Spurney.
There is nothing in the record to indicate to this writer that Spurney was responsible for this insolvency, personally or otherwise, nor that Spurney could foresee what was to happen, nor that he had any "duty", personal or otherwise, "to warn" 9 to 5 or any other contractor of LWE's financial status even if he did know. Absent this showing, I am unable to even imagine how Spurney could be held personally liable in this case.
The majority notes at one point that, procedurally, at LWE (in the ordinary course of things), once a contract was approved, it was referred to the legal staff to work out the details. Then it was executed by Spurney, and assigned to the appropriate division for administration. Elsewhere, it appears that they find that Spurney had the responsibility of securing and *1290 administering the contract. It is clear to me that they are correct in the first instance rather than the second. As stated by the Supreme Court in Canter v. Koehring, 283 So.2d 716 (La.1973), cited by the majority:
"With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm." [Emphasis supplied]
In my view, nothing, anywhere in the record or the trial court's reasons for judgment, or the majority opinion, discloses or supports a "personal" duty of Spurney toward 9 to 5, much less a breach of such duty. The Fryar case cited by the majority held that an employee cannot shield himself behind a corporate wall, under certain circumstances, when he is the officer responsible for the corporation's acts in a particular transaction. There the court found that an officer of an Oklahoma Bank, who was the bank representative directly involved and responsible for the Bank's commitments in Louisiana, had a duty to see that the Bank's obligations were carried out, or to warn the other party that the obligations were not being carried out. Breach of this duty rendered the officer personally liable under these particular circumstances and therefore subject to Louisiana's jurisdiction.
Ardoin v. Robinson, 129 So.2d 105 (La. App. 2 Cir.1961), relied on by 9 to 5, found the defendant corporate president had a personal obligation, under the circumstances of that case, to deliver certain stock held in escrow, which was subject to the complete control of the defendant.
In both cases, the courts found personal liability on the part of the officers who possessed certain information and power solely within their knowledge and control. Such is not the situation in the case before us, in which Spurney, although president of the corporation, did not have it within his power or control to unilaterally approve or appoint a uniform supplier. Such a contract could be awarded only by a consensus vote of the management committee, which was done after the concessions committee recommended to it that 9 to 5 be awarded the contract.
Similarly, the knowledge of information regarding the uniforms contract and its details was possessed by many details was possessed by many staff personnel and committee members as well. All of the initial contacts of 9 to 5 with LWE were with Cynthia Houser (not Spurney). 9 to 5 had no personal contact or communication with Spurney prior to the October 21 meeting. Thereafter, between October and February, there was some scant correspondence with Spurney, but 9 to 5 dealt chiefly with Ann Brown, LWE's corporate counsel. After February, Mary Kate Tews, along with Ms. Brown, were the LWE representatives working with 9 to 5.
Spurney had almost no personal contact with 9 to 5, nor did he personally make the decisions affecting them. This is certainly understandable and logical because, as president, Spurney obviously had hundreds of other duties and was concerned with the broad, overall, decisions affecting the fair. To me, it is inconceivable to imagine Spurney having the time or the inclination to "personally" ruin one contractor (especially one who had so many political endorsements). This would be folly.
The record supports the fact that Spurney agreed to, and in fact did, recommend 9 to 5 to the committee, provided certain conditions (which I find very reasonable) were met. Moreover, Spurney's "agreement" with 9 to 5 to settle the lawsuit *1291 could only have been made in his role as president of LWE. All parties knew that the management committee had to vote on the contract, and, logically, they had no reason to over-estimate Spurney's influence in that committee. Past experience had demonstrated that Spurney, who earlier had voted for and recommended Marlin, could not prevail upon the committee to vote as he did.
The majority attempts to assign an ominous and sinister meaning to Spurney's continuing to harbor doubts about the ability of 9 to 5 to perform and his directing some staff members to inquire as to how late another supplier could step in, in the event of a default on the part of 9 to 5. While such inquiries may show Spurney's lack of faith in 9 to 5, I am at a loss to understand how they injured 9 to 5. No other companies made any attempt to get the contract, nor did Spurney (or anyone) offer the contract to another company; and none were, in fact, hired, and no attempt was made to do so. 9 to 5 was the sole and undisputed supplier of uniforms for LWE from the original agreement to award the uniforms contract to them through the end of the Fair.
I believe the law is clear that an appellate court is not required by the "manifest error" principle to affirm the oversight or refusal of the trier of fact to accept uncontradicted testimony as credible or to take it into consideration; nor its rejection of preponderant, objectively-corroborated testimony where the record indicates no sound reason for its rejection. Neither is an appellate court required to accept factual findings that have been reached by overlooking applicable legal principles. West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979).
For the reasons I have given above, I find that the overall weight of the evidence in this case clearly demonstrates that the conclusions of the trial court are manifestly erroneous or clearly wrong. I am of the opinion that the record as a whole and the proven facts in the present case establish that, throughout the course of events herein, Spurney acted solely in his role as an officer of LWE, and within the course and scope of his employment and office. He did not owe to nor undertake any individual obligations towards 9 to 5, and no personal duties were due or created between the principals herein.
Moreover, there is no evidence that I can find to indicate that in dealing with 9 to 5 Spurney was guilty of intentional misrepresentation, malfeasance, or nonfeasance; and I note again that the trial court and the majority of this court fail to point out exactly and precisely the connection between any alleged conduct of Spurney with any personal duty of his to 9 to 5.
Furthermore, I have been unable to discover any injury or loss occurring to 9 to 5 as a result of Spurney's action or inaction. They were awarded the contract and they timely delivered the uniforms (as the majority admits); they were paid for approximately 85% of their billings before the Fair became financially distressed; and then they were given preferred payment status as a # 1 category creditor. In addition, the evidence strongly indicates that part of their relatively small loss (in proportion to the total amount billed the Fair) was caused by (1) their own fault in using unapproved and improper billing procedure (failure to attach invoices) for a period of time, and (2) their own poor and erroneous calculations which resulted in some of the excess fabric loss. Where, then, is their injury or loss that was deliberately and "personally" caused by Spurney, himself, as an individual? Perhaps this question was best answered by learned counsel for appellant in oral argument when he stated that if LWE had not become insolvent, these allegations of "personal responsibility" against Spurney would never have been made.
It does appear to me that LWE may well be responsible to 9 to 5 for some of their excess fabric loss, but I fail to see how Spurney, personally or as president of LWE, caused this loss himself.
Since I also do not find that Spurney breached duties to 9 to 5 as an officer or director, then, in essence, I find no "Wrongful Acts" to bring Spurney under the "Directors and Officers Liability" *1292 clause of Western World's insurance policy. Accordingly, I do not find Western World liable for anything to 9 to 5 in these proceedings.
I must end this protest on a warning note. In my opinion, if this decision is allowed to stand and becomes the law, then no corporate officer in Louisiana is safe from being held personally liable for action or inaction performed within the course and scope of his employment. This is the greatest and most compelling reason for my refusal to put my stamp of approval on it.
For the above reasons, I respectfully dissent.