535 So.2d 1110 (1988)
Deborah Lynn CATALANOTTO WALLACE, Michael Anthony Catalanotto, Peggy Sue Catalanotto Chenault and Cindy Carol Catalanotto Ballard,
v.
The UPJOHN COMPANY, J. Killian Williams, Claude Azlin, American Cyanamid Company, individually and through its Lederle Division, Bristol-Myers Company, individually and through its Bristol Division, Myrton J. Landry, E.R. Squibb & Sons, Inc., and Pfizer, Inc., individually and through its Roerig Division.
No. CA 87 1250.
Court of Appeal of Louisiana, First Circuit.
November 22, 1988.
Rehearing Denied January 9, 1989.
Writ Denied March 10, 1989.
*1111 C. John Caskey, Paul Due, Baton Rouge, Joseph H. Simpson, Amite, for plaintiff, appellee.
John J. Weigle and Donna G. Klein, New Orleans, for defendants-appellants The Upjohn Co., J. Killian Wiliams and Claude Azlin.
Henry B. Alsobrooke and Joseph M. Gordon, New Orleans, for Bristol-Myers Co., Myrton J. Landry and E.R. Squibb & Sons, appellants.
William F. Bologna, New Orleans, for American Cyanamid, appellant.
Kathleen Manning and Henry Wolbrette, III, New Orleans, for Pfizer, Inc., appellant.
Carole C. Dominguin, New York City, for Pfizer, Inc. appellant.
Edward Carroll and Lisa Tompkins, New Orleans, for Bristol-Myers Co. and Myrton J. Landry, appellants.
Timothy H. Bosler, Liberty, for Bristol-Myers Co. and Myrton J. Landry, appellants.
Before COVINGTON, C.J., and LOTTINGER and FOIL, JJ.
FOIL, Judge.
In this appeal, we are asked to determine the correctness of a judgment holding drug manufacturers and detailmen liable for failing to warn of the tooth staining side effect of tetracycline. We are also asked to review the award along with several evidentiary and procedural rulings of the trial court. We affirm the judgment holding *1112 the manufacturers liable but reverse that portion holding the detailmen liable. We also find no error in the trial court's evidentiary and procedural rulings.

FACTS
These product liability and negligence actions were brought by Deborah Wallace, Michael Catalanotto, Peggy Sue Chenault and Cindy Ballard, all siblings, who experienced tooth discoloration as a result of ingestion of tetracycline medications in early childhood. Named defendants were five tetracycline manufacturers: The Upjohn Company; American Cyanamid Company; Bristol-Myers Co.; E.R. Squibb & Sons Inc.; and Pfizer, Inc. J. Killian Williams, Claude Azlin, and Myrton J. Landry, detailmen who distributed tetracycline to plaintiffs' prescribing physician, were also made defendants.
Plaintiffs took various tetracycline medications manufactured by defendants during the years 1957 to 1961. The crucial issue at trial was whether defendants should have known of the tooth staining side effect of tetracycline prior to 1957.
After a lengthy trial, the trial court held all defendants liable, finding they should have known in 1956 that tooth discoloration could be caused by the ingestion of tetracycline and should have warned of this side effect. This appeal challenges those liability decisions as well as quantum. Additionally, defendants challenge the admission of certain evidence by the trial court and its award of special costs to plaintiffs.

ASSIGNMENTS OF ERROR NOS. 1, 2, 3, 4, 7 AND 8
In these assignments of error, defendants basically complain of the trial court's imposition of liability on the drug manufacturers. Specifically, defendants claim the trial court erred in accepting the testimony of plaintiffs' expert witnesses and rejecting that of various defense experts.
Tetracycline is a broad spectrum antibiotic which was discovered in the late 1940's. It is now firmly established that ingestion of the drug by pregnant women and children during the years of tooth formation (approximately 4 months in utero to age 8) can cause tooth discoloration. Technically, the staining phenomenon occurs because tetracycline "chelates to" or binds with calcium, a metal, while a tooth is undergoing calcification. As a result of this joining, calcium tetracycline complex is formed. The complex becomes incorporated into the dentin or matrix of the teeth and discoloration occurs when the complex is exposed to light. Tetracycline thus inhibits calcium metabolism and causes an intrinsic stain which is developmental in nature.
In addressing the issue of the manufacturer's duty to warn in this case, we are guided by the following principles enunciated by the Louisiana Supreme Court in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 115 (La.1986):
A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user.... In performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby.... A manufacturer also has a duty to test and inspect its product, and the extent of research and experiment must be commensurate with the dangers involved.... (Citations omitted).
There are limitations to the manufacturer's duty to warn, as this court stated in Miller v. Upjohn Co., 465 So.2d 42, 45 (La.App. 1st Cir.), writ denied, 467 So.2d 533 (La. 1985):
As it would be unjust to hold a manufacturer liable for side effects of which it could not reasonably be expected to have knowledge, a manufacturer will be held liable for side effects of which it either knows or should have known, but not for side effects of which it cannot reasonably be expected to know.
Medical literature established the causal relationship between tetracycline ingestion and tooth staining in 1962. During that *1113 year, numerous drug companies applied to the Food and Drug Administration (FDA) for approval of a warning of this side effect on their products. In 1963, the FDA required warnings of the tooth staining side effect on all tetracycline medications.
Clearly, the drug companies actually knew of the tooth staining side effect of tetracycline in the early 1960's. In Miller, supra, a similar suit was brought against tetracycline manufacturers on a failure to warn theory. The plaintiffs in that case ingested tetracycline in 1963 and 1965. This Court held the manufacturers should have warned of the tooth staining side effect prior to the ingestion of the drug by those plaintiffs. Based upon the evidence presented in Miller, this court stated the possibility of the side effect was known at least as early as 1960. We are asked to decide in this case whether the drug companies should have known of the tooth staining propensities of tetracycline prior to 1957.
In attempting to establish 1956 as the crucial time at which the drug companies should have known of the tooth staining phenomenon, plaintiffs' case consisted primarily of three publications and expert opinions as to the import of those publications in assessing the state of knowledge existing at that time. Plaintiffs' experts opined the state of knowledge existing in 1956 was sufficient to alert the drug manufacturers to the possibility tetracycline could cause tooth staining, basing their opinions on three articles published prior to 1957. These articles will be addressed in turn.
In 1951, an article entitled "The Isolation and General Properties of Terramycin and Terramycin Salts", written by Peter Regna was published in the Journal of American Chemical Society (Regna article). This article outlined the chemical and physical properties of Terramycin, a tetracycline medication. Two of plaintiffs' experts credited this article as being the basis for predicting tetracycline could bind with calcium and become incorporated into teeth, thereby interfering with calcium metabolism. Dr. Ibert Wells, a biochemist qualified by the court as an expert in that field, testified the publication had several telling aspects as far as the predictability of the bonding phenomenon was concerned. First, the article identified terramycin as an insoluble compound, providing the first hint that the drug could interfere with calcium metabolism. Secondly, the article reported on a successful experimentation combining the tetracycline with calcium to form Terramycin Calcium Chloride Complex. Doctor Wells admitted the conditions under which the experiment was performed and the conditions existing in the human body are not identical; however, he stated the value of the result of the experiment was that it served as a basis for scientists to predict how the chemical would react in humans. He noted the identification of the tetracycline as insoluble was an important factor in predicting how the chemical would react in the body. Dr. Wells summed up the significance of the Regna article by admitting that, although no one could definitely state tetracycline would bind with calcium and become incorporated into the tooth structure, one could definitely state it was possible the two could combine and become incorporated into the tooth structure.
Dr. Robert Geiger, a pharmacist specializing in pharmacology, the study of reactional activities of chemical substances, added the value of the Regna article lies in the fact it identified the chemical properties of the tetracycline medication. Once a chemical formula for a given substance is known, he stated, it is possible to predict how the substance will react in combination with other chemical substances. This prediction is possible without having to experiment in a laboratory: simply by diagraming the chemical structure of a compound, a scientist can predict the ability of different chemicals to chelate or bind together. He believed in 1952, any person with knowledge of the structural relationships of molecules could have diagramed the structural formula of tetracycline and from it could predict how it would react in the presence of a metallic substance such as calcium, which is the fifth most common element in the body. Thus, he stated by 1952, with knowledge of the chemical composition *1114 of terramycin, one could predict the possibility tetracycline could form a chelation with calcium and become incorporated into the matrix of bones and teeth.
The experts also relied on a 1951 article as forming the basis for the predictability of the joining of calcium and tetracycline and its adverse effect on human teeth. Dr. Lester Roth's article, "Significance of Discoloration of Natural and Artificial Teeth Which May Occur With the Use of Aureomycin", was published in New York Journal of Dentistry in 1951 (Roth article). This article reported the topical application of aureomycin, a tetracycline drug, on human teeth resulted in a yellow staining of the teeth. The researcher stated it did not "appear" the staining was permanent as long as the material was promptly removed from the teeth. However, he recommended the use of the substance on a permanent basis, such as a capping material, be limited to posterior teeth. Dr. Joseph O'Neil, qualified by the court as an expert on the history and development of tetracyclines, believed this article, along with the Regna article, established the basis for predicting the chelation phenomenon and its potential injurious effect on the human teeth.
Drs. O'Neil, Wells and Geiger all stated the prediction tetracycline and calcium could combine in a manner harmful to the teeth was confirmed in 1956 with the publication of "The Tetracyclines", written by Dr. Harry Shwachman, in the Pediatric Clinics of North America (Shwachman article). This article reported results of a study of side effects from administration of tetracyclines on a long term basis to infants and young children who had the disease cystic fibrosis. Under the heading "Toxicity", the author noted "[o]f special interest is the discoloration of the temporary teeth which we noted in 5 per cent of the patients involved. The entire tooth structure seems to be uniformly involved.... To our knowledge the reaction has not been reported before."
Drs. O'Neil, Wells and Geiger testified a 5 per cent incidence is medically significant. These experts agreed this article, viewed in relation to the previously published literature, should have alerted the drug companies to the possibility tetracycline could cause tooth discoloration. Dr. Wells summarized the significance of the Shwachman article by stating, it "fit hand in glove as far as ... the predictability and the confirmation of the prediction." Dr. Wells also testified there were several methods known to scientists in 1956 by which tetracycline could have been extracted from a stained tooth, thereby definitely establishing the link between the two.
Dr. O'Neil testified, based on his knowledge of the three articles, as well as results of studies published in 1956 showing bone staining in animals administered tetracycline, the drug companies should have warned of the staining propensities of tetracycline in 1956. Although Dr. O'Neil testified in Miller the drug companies should have warned in 1962, he based his opinion in this case on literature unavailable to him in the Miller case, namely the Roth article and the 1956 animal studies. Additionally, Dr. Charles Bombet, a pediatrician practicing in the Baton Rouge area since 1945, stated the drug manufacturers should have warned pediatricians of the tooth staining phenomenon reported in the Shwachman article. He also testified had he read the Shwachman article in 1956, he probably would have discontinued use of the drug pending further research by the drug companies.
The defendants offered considerable conflicting expert testimony with respect to the medical knowledge existing in 1956. In short, all of defendants' experts discounted the significance of the three articles relied on by plaintiffs' experts, testifying none served as a basis for making the connection between tetracycline and tooth staining.
Among the multitude of witnesses presented by the defense were the following, who were accepted by the court as experts in a variety of fields. Dr. Lucas Kulczycki is a professor of pediatrics who worked with Dr. Shwachman from 1955 to 1961. He was co-author of a 1958 article written by Dr. Shwachman regarding antibiotic therapy in patients with cystic fibrosis. *1115 Dr. Robert Blackwood is a chemist who has been employed by defendant, Pfizer, since 1955. He did research full time on tetracyclines from 1957 to 1967. Dr. John Noble has been employed by defendant, American Cyanamid Company, since 1960. He is currently Director of Toxicology Research. Dr. Kotaro Murai has been a chemist with defendant, Pfizer, since 1949. He is a co-author of the Regna article. Dr. Edward Sweeney is a pediatric dentist and teacher. Dr. James Goddard is a former commissioner of the Food and Drug Administration and an expert in the field of public health. Dr. John Beck is a retired family internist who previously worked for defendants, Pfizer and Squibb, for thirteen years. While at Squibb, he was clinical research director and handled adverse reaction reports on tetracyclines. Dr. Edward Wasserman is a pediatrician who testified as a witness for a drug company in another tetracycline warning case.
Dr. Murai, co-author of the Regna article, testified that, at the time the article was written in 1951, the structure of terramycin was unknown. Thus, the article merely attested to the fact there was evidence to prove the existence of calcium chelates. Dr. Blackwood pointed out it was not until the structure of terramycin was known that it became clear the article was referring to a calcium chelate. Drs. Blackwood and Sweeney both noted the Regna article dealt strictly with chemistry, and had nothing to do with tooth staining as a side effect of ingestion of a tetracycline. Dr. Goddard attributed no significance to the article on the basis one cannot rely on chemical reactions in the laboratory or in animal studies to predict what will happen in humans. Drs. Murai, Blackwood, Sweeney, Noble and Wasserman all agreed that, based on the Regna article, it was impossible to predict a link between discoloration of teeth and tetracycline ingestion.
In an attempt to undermine the significance of the 1951 Roth article, Dr. Sweeney noted the study was not even concerned with ingestion, but merely the topical application of tetracycline. He observed many other things will stain the teeth, e.g. coffee or blueberry pie. Dr. Noble stressed no permanent discoloration was confirmed by the Roth article.
Numerous defense experts testified with respect to the controversial significance of the Shwachman article. Dr. Kulczycki testified he worked with Dr. Shwachman from 1955 to 1961, becoming his main assistant in 1956. He stated neither he nor Dr. Shwachman knew at the time of the 1956 article what caused tooth discoloration. Dr. Kulczycki declared the article in no way conveyed or suggested that the antibiotics were the cause of or even contributed to the tooth discoloration noted in the article. He noted even the 1958 article which he co-authored, which was the first time tooth discoloration was reported as a side effect, does not represent documentation regarding tooth staining, but was merely a casual observation. Dr. Noble testified the Shwachman article does not indicate, associate, or link tetracycline ingestion to tooth discoloration of the permanent teeth. However, in a deposition of Dr. Noble taken in other litigation which was introduced at trial, he stated, to his recollection, the earliest reports of possible adverse effects of tetracyclines on teeth were in 1956, in which Dr. Shwachman reported the effects on children with cystic fibrosis who had been receiving tetracyclines for a very protracted period of time. Dr. Sweeney stated the Shwachman article establishes no cause and effect relationship between ingestion of tetracycline and tooth staining or hypoplasia. However, on cross examination, he admitted he published an article in 1965 in which he stated the 1956 Shwachman article reported dental staining in children who had been given tetracycline that was apparently related to the administration of the antibody. [Emphasis ours] Drs. Blackwood, Goddard and Wasserman testified to the effect neither the 1956 or 1958 Shwachman articles drew any conclusions regarding the cause of the tooth staining that was observed. Dr. Beck stated he met with Dr. Shwachman in 1962 and reviewed the literature written by Dr. Shwachman. He testified Dr. Shwachman told him he was not certain of the cause of the tooth discoloration noted in *1116 the literature. Dr. Shwachman showed him some loose stained teeth, but he did not take any of the teeth back to Pfizer for analysis. Dr. Murai testified he does not feel the technology existed at Pfizer in 1956 to do a qualitative analysis on human teeth to determine the presence of tetracycline, but he is not really sure.
After taking the case under advisement and reviewing the abundant testimony presented, the trial court held the drug companies should have known of the tooth staining potential of tetracycline in 1956 and should have warned of this side effect. Commenting on the evidence offered by both sides and the duty of the manufacturers, the trial court stated:
Much has been said by both sides about the articles of Dr. Shwachman, however, their importance lies in the fact that they indicate a problem.... Again, Dr. Shwachman had no responsibility to the drug companies, and was not attempting an experiment for the sake of the drug companies as to the effect tetracycline had on the teeth of children. It was up to the drug companies, who were monitoring this material, to realize the relationship between the tooth staining and tetracycline. It was up to them to begin to conduct whatever experiments were necessary, or to take whatever action was necessary to see if their drug was totally safe for use on very young children's teeth.
Defendants contend plaintiffs failed to prove their case by a preponderance of the evidence, and argue the trial court committed manifest error in choosing to accept plaintiffs' expert testimony over the testimony of its experts. Defendants submit plaintiffs' experts were either unqualified and not credible or were not as qualified as their experts, some of whom were working with tetracycline in the 1950's, to give opinions as to when the drug companies should have known of the association between tetracycline and tooth staining. Defendants stress none of plaintiffs' experts worked with tetracycline in the 1950's and, because their opinions were made with the benefit of hindsight, they are entitled to less weight than those of its experts.
In Holmes v. Southeastern Fidelity Insurance Co., 422 So.2d 1200, 1203-1204 (La.App. 1st Cir.1982), writ denied, 429 So.2d 133 (La.1983), this Court set forth, in pertinent part, the following standard for evaluating expert testimony:
The finder of fact, be it judge or jury, should assess the credibility of witnesses, expert or lay, to determine the most credible and realistic evidence.... In reaching conclusions, the finder of fact need not accept all of the testimony of any witness as being true or false and may believe and accept a part or parts of a witness' testimony and refuse to accept any part or parts thereof.... The opinions of expert witnesses are not binding on the finder of fact and are to be weighed the same as any other evidence.... The weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the opinion is based.... The fact finder's evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong. (Citations omitted.)
We hold the trial court's conclusion, based upon its evaluation of the expert testimony, that drug companies should have warned of the side effect of tetracycline in 1956, is not manifestly erroneous. We find no manifest error in the trial court's acceptance of plaintiffs' witnesses as experts qualified to express opinions regarding the state of medical knowledge in 1956 and in its acceptance of that testimony as credible and reliable. We specifically agree with the trial court's observation that, although the 1956 Shwachman article did not suggest that antibiotics caused the tooth discoloration, it should have alerted the drug companies to the possibility tetracycline was the culprit. It was not the responsibility of Dr. Shwachman or anyone else, other than the drug manufacturers, to discover the side effects of their drug and warn of those side effects. The trial court's conclusion regarding the state of medical knowledge in 1956 is amply supported by the evidence. Accordingly, we affirm the portion of the trial *1117 court's judgment holding the drug manufacturers liable to plaintiffs.

ASSIGNMENTS OF ERROR NOS. 5 AND 6
These assignments of error concern the duties and liability of the detailmen J. Killian Williams, Claude Azlin and Myrton J. Landry. We reverse the judgment of the trial court holding these defendants personally liable.
Myrton J. Landry was employed by Bristol-Myers Company and J. Killian Williams and Claude Azlin were employed by The Upjohn Company as detailmen, which are essentially salesmen or field representatives of the drug companies. Detailmen distribute product samples, deliver package inserts and communicate warnings contained in the inserts to physicians in their territory. Drug companies use package inserts to warn physicians of the side effects and adverse reactions associated with their products. All printed advertisements in medical literature include the package inserts. The package inserts are also compiled in the Physicians' Desk Reference (PDR), which is updated annually and a copy sent to physicians nationwide.
The law is settled that if an employee of a corporation through his fault injures another to whom he owes a personal duty, whether or not the act culminating in the injury is committed by or for the corporation, the employee is liable personally to the injured third person; it does not matter that liability might attach to the corporation. La.Civ.Code art. 2315; Canter v. Koehring Company, 283 So.2d 716 (La. 1973); Miller v. Upjohn Co., supra.
However, the Louisiana Supreme Court in Canter v. Koehring Company, supra at 721, held, in pertinent part, the plaintiff must meet the following criteria in order to sue an employee individually:
1. The principal or employer owes a duty of care to the third person ... breach of which has caused the damage to which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached his duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages....
We conclude that, under the Canter criteria and the facts of this case, Williams, Azlin and Landry were not negligent. The only personal duty these detailmen had toward plaintiffs was to deliver and explain the new package inserts to the physicians in their territory, which included plaintiffs' physician, Dr. Scarle. The uncontradicted testimony (in depositions taken in connection with other litigation) of these defendants indicates that they did so. See Miller v. Upjohn Co., supra at 47. Azlin and Landry stated they were not aware of the danger of tooth staining until the 1960's when the drug manufacturers informed them of the phenomenon. Likewise, Williams stated he knew nothing about tooth staining until approximately 1963. We note that the warnings did not appear in the package inserts until 1963 supports their assertions.
The trial court found the testimony of Dr. Powley, a spokesman of Upjohn, to be noteworthy. Dr. Powley stated the detailmen attended conferences every two months to bring them up to date on the products they sold. The court then observed *1118 that Mr. Whitfield, an employee of The Upjohn Company, testified the 1956 Shwachman article was reviewed and circulated within the company shortly after its publication. Without specifically saying so, the trial court must have concluded the detailmen knew of the tooth staining phenomenon and breached their duty toward plaintiffs. This conclusion is simply not supported by the evidence. The judgment against the detailmen should be reversed.

ASSIGNMENTS OF ERROR NOS. 9, 10, 11, 12, 13, 14, AND 15
By means of these assignments, defendants cite as error the trial court's allowing the introduction of certain documentary evidence and depositions. In reaching a decision on these alleged procedural errors, we have to consider (1) was the particular ruling complained of in error and, if so, (2) did the error harm or prejudice the defendants' cause, for unless it does, reversal is not warranted. Further, the parties alleging error have the burden of showing the error was prejudicial to their case. In other words, the determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case. Neumeyer v. Terral, 478 So.2d 1281 (La.App. 5th Cir.1985) writ denied, 481 So.2d 631 (La.1986); Parker v. South La. Contractors, Inc., 370 So.2d 1310 (La.App. 1st Cir.), writ denied, 374 So.2d 662 (La.1979).
We find appellants have failed to present to this Court how the possible prejudicial effect of such evidence had any substantial bearing on the conclusions reached by the trial court.

ASSIGNMENT OF ERROR NO. 16
In this assignment, defendants allege the trial court erred in assessing costs against them after they perfected the instant appeal which divested the trial court of its jurisdiction to do so. Alternatively, defendants claim plaintiffs' request for reimbursement of special costs is excessive and not supported by positive law. Specifically, defendants assert La.R.S. 13:4533 does not allow the cost of discovery depositions not used at trial to be charged against defendants. These arguments are meritless.
La.Code Civ.P. art. 2088 provides, in pertinent part, as follows:
The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal or on the granting of the order of appeal, in the case of a devolutive appeal. Thereafter, the trial court has jurisdiction in the case only over those matters not reviewable under the appeal, including the right to:
. . . . .
(10) Set and tax costs and expert witness fees.
Clearly, the trial court had jurisdiction to assess court costs and expert witness fees.
In assessing costs for discovery depositions, the trial court is guided by the following rules. La.Code Civ.P. art. 1920 provides:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
Moreover, La.R.S. 13:3666 provides, in pertinent part:
A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:

*1119 (1) from the testimony adduced upon the trial of the cause, the court shall determine the amount thereof and include same or,
(2) by rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause.
Finally, La.R.S. 13:4533 states:
The costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.
Our Louisiana Supreme Court has construed the above term, depositions "used on the trial", to mean those depositions introduced and accepted in evidence. See Succession of Franz, 242 La. 875, 139 So. 2d 216 (La.1962). As all of the depositions for which plaintiffs sought reimbursement were introduced into evidence at trial, the court properly allowed the same as costs.
Finally, the amount of expert witness fees is a matter within the discretion of the trial court and should not be disturbed unless found to be manifestly erroneous. Ditch v. Finkelstein, 399 So.2d 1216 (La. App. 1st Cir.1981). We find no such error in this case.

QUANTUM
Although not assigned as error, defendants argue the damages awarded plaintiffs by the trial court are excessive. First, we note this Court will not review issues not set forth in an assignment of error. Uniform RulesCourts of Appeal, Rule 1-3.
In any event, before a court of appeal can disturb an award made by a trial court the record must clearly reveal that the trier of fact abused his discretion in making his award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). Before an appellate court can disturb a factual finding by the trial court, it must determine that the finding is manifestly erroneous and has no reasonable factual basis. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, supra.
In this case we find that the record clearly supports the awards made by the trial court.
Accordingly, the judgment of the trial court in favor of plaintiffs and against The Upjohn Company, American Cyanamid Company, Bristol-Myers Company, E.R. Squibb & Sons, Inc. and Pfizer, Inc. is affirmed, and that against J. Killian Williams, Claude Azlin and Myrton J. Landry is reversed. Costs are to be borne by those appellants against whom the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART