674 So.2d 299 (1996)
Louise BOUTTE, Plaintiff-Appellant
v.
WINN-DIXIE LOUISIANA, INC., Defendant-Appellee.
No. 95-1123.
Court of Appeal of Louisiana, Third Circuit.
April 17, 1996.
Rehearing Denied June 25, 1996.
*301 David Sinnott Bland, New Orleans, for Louise Boutte.
David John Calogero, Lafayette, for Winn-Dixie Louisiana, Inc.
Before THIBODEAUX, SAUNDERS, AMY, SULLIVAN and GREMILLION, JJ.
SAUNDERS, Judge.
In this slip and fall case, the jury determined from the evidence that plaintiff slipped and fell in a Winn-Dixie store and was injured as a result of her fall, but refused to impose liability upon Winn-Dixie under La. R.S. 9:2800.6, concluding that Winn-Dixie did not have constructive notice of the premises hazard. Plaintiff appeals on this basis. In addition, she assigns as error the allegedly improper admission of testimony by plaintiff's treating physician following ex parte communications between this physician and defense counsel, and defendant's allegedly inflammatory closing arguments.
We hold that the trial court erred in admitting the ill-gotten gains of defense counsel's illicit ex parte communication and in failing to curb defendant's closing arguments by jury instruction or otherwise and reverse on these bases. Moreover, after reviewing the record de novo, we award damages, finding that plaintiff established constructive notice and the other elements of her case.

FACTS
Late Saturday evening, June 26, 1993, plaintiff, Louise Boutte, and her son, Lance Credeur, entered the Winn-Dixie store in New Iberia. About five minutes later, Ms. Boutte walked into Aisle 12 where she slipped and fell on purple liquid that apparently had leaked undetected onto the floor from another customer's buggy.
After hearing the evidence between March 6-9, 1995, the jury was presented with interrogatories, including the two reproduced below:

*302 1. Do you find that the plaintiff, Louise Boutte, was injured on June 26, 1993, in the Winn-Dixie store?
2. Do you find from a preponderance of the evidence that the defendant, Winn-Dixie was guilty of negligence which proximately caused the accident in question?
They answered affirmatively to the first interrogatory in its verdict form and negatively to the second. Because the jury answered negatively to the second question, it was directed to proceed no further.[1]

LAW AND ARGUMENTS
La.R.S. 9:2800.6 is the law which controls this appeal:
Sec. 2800.6. Burden of proof in claims against merchants
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, and in addition to all other elements of his cause of action, that:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable;

(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence; and
(3) The merchant failed to exercise reasonable care.
C. Definitions:
(1) "Constructive notice" means the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care.
(2) "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business.
D. Nothing herein shall affect any liability which a merchant may have under Civil Code Arts. 660, 667, 669, 2317, 2322 or 2695.
The question is whether plaintiff legally discharged her legal obligations under La. R.S. 9:2800.6.
Plaintiff has clearly shown by a preponderance that she has sustained injuries from a fall on Winn-Dixie's premises. This much is uncontradicted. Moreover, the evidence clearly supports her position that she slipped on a foreign liquid resting on the floor of the Winn-Dixie aisle where she fell, as her uncontradicted testimony on the point is supported by the testimony of not only her son but by that of Winn-Dixie employee, Chris Johnson, who saw evidence of the leak not only at the accident scene but on at least one earlier aisle.
Thus, we must conclude that she has complied with La.R.S. 9:2800.6(B)(1), which required that she establish that the premise's condition presented an unreasonable risk of harm and one that was reasonably foreseeable. In the context of slip and fall cases, a hazard is shown to exist when the fall results from a foreign substance on the floor or from an otherwise unreasonably slippery condition. Saucier v. Kugler, Inc., 628 So.2d 1309 (La.App. 3 Cir.1993). See also Gonzales v. Winn-Dixie Louisiana, Inc., 326 So.2d 486 (La.1976); Kavlich v. Kramer, 315 So.2d 282 (La.1975); Kinchen v. J.C. Penney Co., Inc., 426 So.2d 681 (La.App. 1 Cir.1982), writ denied, 431 So.2d 774 (La. 1983). Likewise, the risk of harm created by such a condition in a high traffic self-service supermarket is clearly foreseeable to the *303 merchant. Saucier v. Kugler, 628 So.2d 1309.
With respect to whether Winn-Dixie had prior notice of the hazard that befell its store patron, it is clear that the jury did not err in concluding that Winn-Dixie lacked actual notice, as there is nothing on the record to contradict this conclusion. Thus, we examine the more vital issues of whether Winn-Dixie possessed constructive notice and failed to exercise reasonable care under the circumstances.
On appeal, plaintiff maintains that the jury erred in failing to find constructive notice on the part of Winn-Dixie. Alluding to what she views to be "objective" evidence, plaintiff claims that a minimum of thirty-four (34) minutes elapsed between the time of Winn-Dixie's last inspection and the time of the accident. This "objective" evidence consisted of the time card of the Winn-Dixie employee plaintiff maintains was charged with inspecting and maintaining Aisle 12 on the fateful evening of June 26, 1993. This card revealed that the employee, Chris Johnson, punched in at work for the evening shift at 2:57 p.m., punched out for supper at 8:34 p.m., and punched back in at 9:08 p.m., thirty-four (34) minutes later, and after plaintiff claims to have fallen at 9:05 p.m.
According to plaintiff, this evidence contradicts Mr. Johnson's vague recollection that he had checked the affected section of the store fifteen (15) minutes before plaintiff's fall.
Winn-Dixie, on the other hand, maintains that the accident occurred soon after 10:00 p.m., while young Johnson was working on Aisle 13. Additionally, Winn-Dixie maintains that even if the accident occurred at 9:05 p.m., as suggested by plaintiff, Johnson's whereabouts are of little concern as he was not charged with aisle check responsibilities until after 9:00 p.m.[2]
Here, the jury clearly was persuaded by defendant's version of events. It concluded that Winn-Dixie's inspections were conducted within a reasonable period within the strictures of La.R.S. 9:2800.6, and that plaintiff failed to establish that Winn-Dixie had constructive notice of the hazards on its premises. To reach this conclusion, the jury determined that the testimony of Winn-Dixie's witnesses were more credible than that of plaintiff and her son. The trial court rendered judgment consistent with the jury's findings.
Ordinarily, such a factual conclusion, although subject to review by this court, Ambrose v. New Orleans Police Amb. Serv., 93-3099 (La. 7/5/94), 639 So.2d 216, would demand great deference on appeal.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Canter [v. Koehring], supra [283 So.2d 716] at 724 [(La.1973)]; Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825, 826 (La.1987); Boulos v. Morrison, 503 So.2d 1, 3 (La.1987); Williams v. Keystone General Contractors, Inc., 488 So.2d 999, 1001 (La.1986); Johnson v. Insurance Co. of North America, 454 So.2d 1113, 1117 (La.1984); Berry v. Livingston Roofing Co., 403 So.2d 1247, 1249 (La.1981); Crump v. Hartford Accident & Indemnity Co., 367 So.2d 300, 301 (La.1979).
Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Because the trial of this matter amounted to a basic swearing contest, absent some legal error to interdict the basis of the jury's findings, we would be quite reluctant to upset its conclusions, particularly since the record contains no evidence by either Glenn Martin or Claude Simmons, the employees Winn-Dixie alleges to have been responsible for supervising Aisle 12 before 9:00 p.m., to cast doubt on Winn-Dixie's version of events.[3]

*304 The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Canter v. Koehring, 283 So.2d 716, 724 (La. 1973).
Nonetheless, where such a legal error is present, further scrutiny is required, for the manifest error-clearly wrong standard of appellate review "assumes that consequential evidentiary rulings and instructions on the law were correct and proper." McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986), citing Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980). Thus, the standard applies not "when the jury verdict is tainted by error," but "only to jury verdicts which follow properly conducted trials." McLean v. Hunter, 495 So.2d at 1304.
When a jury is given incorrect instructions in the law, or when a trial court makes a consequential error in the exclusion of evidence, no weight should be accorded the judgment of the trial court which implements the jury verdict. See, Thomas v. Missouri Pacific R. Co., 466 So.2d 1280 (La.1985); Otto v. State Farm Mut. Auto. Ins. Co., 455 So.2d 1175 (La.1984); Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
McLean v. Hunter, 495 So.2d at 1304.
In her third assigned error, plaintiff argues that Dr. Clifton Shepherd should not have been allowed to testify because defense counsel violated Louisiana law and public policy by using an illegal medical release and by conducting ex parte communications with Dr. Shepherd, who was plaintiff's treating physician.
There is no question that plaintiff makes a valid point. Winn-Dixie's contact with Dr. Shepherd was impermissible.
La.Code Evid. art. 510 provides in pertinent part as follows:

* * * * * *
B. (1) General rule of privilege in civil proceedings. In a non-criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself or his representative, his health care provider, or their representatives.
(2) Exceptions. There is no privilege under this Article in a non-criminal proceeding as to a communication:

(a) When the communication relates to the health condition of a patient who brings or asserts a personal injury claim in a judicial or worker's compensation proceeding.
* * * * * *

E. The exceptions to the privilege set forth in Paragraph B(2) shall constitute a waiver of the privilege only as to testimony at trial or to discovery of the privileged communication by one of the discovery methods authorized by Code of Civil Procedure Article 1421 et seq. and in accordance with the applicable provisions of Part II of Chapter 17 of Title 13 of the Louisiana Revised Statutes of 1950[4]; provided *305 that there shall be no health care provider-patient privilege in medical malpractice claims as defined in R.S. 40:1299.41 et seq. as to information reasonably related and relevant to the defense of the merits of said medical malpractice claims.
(Footnote and emphasis added.)
As explicitly noted in La.Code Evid. art. 510(E), Winn-Dixie was required to adhere to the limitations set forth in La.Civ.Code art. 1465.1, whose dispositive provisions follow:
Art. 1465.1. Requests for release of medical records
A. Any party may serve upon the plaintiff or upon any other party whose medical records are relevant to an issue in the case a request that the plaintiff or other authorized person sign a medical records release authorizing the health care provider to release to the requesting party the medical records of the party whose medical condition is at issue. The release shall be directed to a specific health care provider, shall authorize the release of medical records only, and shall state that the release does not authorize verbal communications by the health care provider to the requesting party.

* * * * * *
La.Code Civ.P. art. 1465.1 (Emphasis added).
Because Winn-Dixie's authorization did not contain the restrictive language emphasized above, there is no question that plaintiff's argument is meritorious. Winn-Dixie does not deny that this communication occurred, nor even that its contact was inappropriate.[5] Rather defendant suggests that plaintiff waived this defense when she returned to Winn-Dixie the authorization she was provided. The record does not support Winn-Dixie's waiver theory, for while it is true that plaintiff returned a signed release, she did so subject to objection for the authorization's failure "to comply with article 1465.1 of the Louisiana Code of Civil Procedure," explicitly "without waving any rights thereunder."
We therefore consider whether defendant's illicit introduction of privileged evidence and plaintiff's timely objection mandate reversal.
While it is the responsibility of the appellate court to ascertain if error has been committed, it is important that the error detected be weighed to determine whether such error is harmless or prejudicial.
Lauro v. Travelers Insurance Company, 261 So.2d 261 (La.App. 4 Cir.), writ denied, 262 So.2d 787 (La.1972).
Reversal is not warranted unless the error harmed or prejudiced the complaining party's cause. Neumeyer v. Terral, 478 So.2d 1281 (La.App. 5 Cir.1985), writ denied, 481 So.2d 631 (La.1986). See also Brumfield v. Guilmino, 93-0366 (La.App. 1 Cir. 3/11/94), 633 So.2d 903; writ denied, 94-0806 (La. 5/6/94), 637 So.2d 1056, citing Wallace v. Upjohn Company, 535 So.2d 1110 (La.App. 1 Cir. 1988), writ denied, 539 So.2d 630 (La. 1989); Parker v. South La. Contractors, Inc., 370 So.2d 1310 (La.App. 1 Cir.), writ denied, 374 So.2d 662 (La.1979).
"Further, the party alleging error has the burden of showing that the error was prejudicial to his case." Hesser v. Richardson, 579 So.2d 1136, 1140 (La.App. 2 Cir. 1991). Thus, we ask: Did the error, when compared to the record as a whole, have a substantial effect on the case? LaCombe v. Dr. Walter Olin Moss Reg. Hosp., 617 So.2d 612 (La.App. 3 Cir.), writ denied, 626 So.2d 1187 (La.1993).
Defendant suggests that its meeting with Dr. Shepherd, although improper, had no bearing on the outcome of the case insofar as his opinion was sought simply to rule out carpal tunnel syndrome. It maintains that the illicit contact in no way related to the liability issue which the jury found dispositive.
*306 Under the circumstances, we are unable to say that defendant's clear abuse of justice, even if not ill intended, did not have a substantial impact on the course of events. First, there is no question that Dr. Shepherd, plaintiff's treating physician, divulged privileged information.[6] Second, we believe the effect of his testimony was to cast a pall over the entire proceedings. We observe that the questioning of Dr. Shepherd, who was called not by plaintiff but by Winn-Dixie, while intended in part to offer evidence on the narrow question of whether plaintiff's injuries included carpal tunnel syndrome, in fact appears to have had the added effects of startling plaintiff's counsel and casting a cloud over plaintiff's overall credibility as a witness.[7]
Our review of the evidence leads us to believe that, without this damaging evidence, the jury would have decided the case differently, particularly had her counsel been able to prepare for its introduction.[8] The evidence was that close.[9]
Moreover, this impermissible contact was not the only act to deprive plaintiff of her right to a fair and impartial hearing. Plaintiff argues that Winn-Dixie's closing argument fanned the jury's prejudice in several respects, two of them with which we agree.
In closing Winn-Dixie suggested that a finding of liability on its part would cause the cost of goods for its consumers, including the jurors, to rise. The standards set forth in the Rules of Professional Conduct governing the conduct of attorneys have the force and effect of law. Succession of Cloud, 530 So.2d 1146 (La.1988). Rule 3.4(e) states:
Rule 3.4. Fairness to opposing party and counsel

A lawyer shall not:

* * * * * *
(e) In trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused.
Although a litigant is afforded some license in closing argument, here Winn-Dixie, by deliberately resorting to local prejudice [10] and unsupported generalities, clearly crossed its bounds. Since its counsel's "testimony" was not given under oath or subject to cross-examination, it should not have been allowed. See generally, State v. Floyd, 544 So.2d 616 (La.App. 3 Cir.1989).[11]
Similarly, Winn-Dixie's insinuation that plaintiff's medical treatment was produced from some conniving "medical/legal *307 machine,"[12] rather than from her legitimate needs, was not only unsubstantiated but unduly prejudicial, having the effect of shrouding plaintiff's case in currently fashionable anti-lawyer sentiments and diverting the jury from deciding the case before it solely on the merits, which is to say, on the basis of the evidence.
While it is arguable that either act by Winn-Dixie taken in isolation illegitimated the jury's findings, certainly both[13] had a substantial effect on the presentation and outcome of her case. Consequently, we conclude that plaintiff has established not only error at trial, but that she was prejudiced by the error.
RESOLUTION
What an appellate court must do at this juncture is make an independent review of the record before it and decide which party should prevail by a preponderance of the evidence.
McLean v. Hunter, 495 So.2d at 1304, citing Gonzales v. Xerox Corp, 320 So.2d 163.
Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.
This is not to say, and Gonzales should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly equal that a first-hand view of witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial.
Ragas v. Argonaut Southwest Ins. Co., 388 So.2d at 708.
Having reviewed the record, we conclude that absent defendant's contact of Dr. Shepherd in violation of La.Code Evid. art. 510 and art. 1465.1 of the La.Code of Civil Procedure, plaintiff proved her case.
Ms. Boutte's depiction of events the day of her fall is generally supported by her 15 year old son at trial. His testimony on March 7, 1995, was to the effect that moments after her fall, he saw his mother sitting on her buttocks, with both hands touching the ground behind her. That night, her pains increased causing her to lose sleep and requiring medical attention the following day at Iberia General Hospital.
His testimony also supported her allegations with respect to her pre- and post-accident condition. Before her fall, plaintiff had no back or hand problems, but ever since the spill, she has been plagued by pains in varying degrees.
Plaintiff established that the pains persisted from the date of the accident through trial. Ms. Boutte, 41 at the time of trial, indicated that her principal complaints at Iberia General Hospital on June 27, the day after her fall, related to her back, leg and hand. She then saw Dr. J.L. Comeaux, her family doctor since at least 1976, with similar complaints. On July 2, Dr. Comeaux referred *308 her to Dr. Clifton Shepherd, an orthopedic surgeon. Dr. Shepherd followed his patient's course from July 6, 1993 through February 22, 1994, primarily for her back and neck pains. Dr. Shepherd's initial diagnosis was cervical and lumbar strains for which he prescribed medication, bed rest and a moist heating pad. Noting no improvement by July 13, 1993, Dr. Shepherd administered a Cortisone injection and prescribed therapy in addition. By August 3, 1993, his patient's neck had improved, but not her back, requiring testing. By December 1, 1993, her condition had apparently digressed. In addition to numbness and tingling in her right hand[14], Dr. Shepherd noted complaints of pain in plaintiff's lower back, left leg and neck, leading him to prescribe additional tests for her neck. By December 16, 1993, Dr. Shepherd noted no improvement or perhaps some worsening of plaintiff's pains, and "right arm numbness that goes into the hand." Reviewing the results of the MRI and CT scans of plaintiff's neck, Dr. Shepherd ruled out surgery, instead prescribing additional medical and a follow-up visit in January 1994. When she returned on January 5, 1994, plaintiff reported worsening back and neck pains but, according to Dr. Shepherd, apparently did "feel a little improvement in her right arm and hand numbness." With no marked change in her condition by January 26, 1994, Dr. Shepherd again prescribed medication and follow-up. By February 23, 1994, plaintiff again reported worsening back and neck pains, but "no real changes in her right arm numbness."
Impatient with the progress she had been making with Dr. Shepherd, Ms. Boutte never returned to see him but instead was referred for follow-up care by her attorney to Dr. Christopher Cenac, another orthopedic surgeon. His diagnosis appears to have matched Dr. Shepherd's, except that Dr. Cenac, unlike Dr. Shepherd, believed that the diagnostic tests having ruled out cervical disc troubles, made carpal tunnel syndrome the likely culprit for plaintiff's continuing hand difficulties. Tests conducted in March and April 1994 revealed, in Dr. Cenac's opinion, a need for carpal tunnel release and steroid injection. Ms. Boutte's carpal tunnel syndrome was successfully treated by an operation on May 4, 1994, with a successful outcome noted by Dr. Cenac's June 29, 1994, report. With respect to her bulging disc at L4/5, Dr. Cenac believed that surgery was not practicable, prompting him to issue a 10% overall disability rating on his patient on October 11, 1994, an opinion that was restated by him March 2, 1995.

DAMAGES
Based on the foregoing, plaintiff seeks damages for past medical expenses, past and future loss of earnings, and past pain and suffering. In addition, she maintains that she probably will need a lumbar disc operation and thus seeks future medical expenses and damages for future scarring and disfigurement, in addition to damages she maintains she is owed for her carpal tunnel release operation.
Assuming liability on its part, which it has steadfastly denied, Winn-Dixie maintains that none of the expenses relating to Ms. Boutte's carpal tunnel syndrome is compensable; beyond that, defendant simply asks that we award the minimum damages that would be reasonable under the circumstances.
In response to the former, we observe that the only admissible evidence upon which Winn-Dixie relies to rebut the case plaintiff made as to carpal tunnel syndrome stems from Dr. McDaniel's testimony. Dr. McDaniel, however, admitted that he did not have all of plaintiff's medical reports when he made his assessment. Additionally, as noted above, his conclusion was based upon the mistaken assumption that only two of plaintiff's fingers hurt in the months following the accident when, as observed by Dr. Cenac (who, unlike Dr. McDaniel, actually followed Ms. Boutte's case for more than a year), this was not the case. Finally, Dr. McDaniel conceded that he had only seen Ms. Boutte on one occasion, two weeks before trial, for 15 or 20 minutes and only for evaluation purposes, never as a treating physician. These factors, combined with the undisputed *309 fact that by the late hour that Dr. McDaniel saw Ms. Boutte, her carpal tunnel syndrome had been healed by Dr. Cenac's surgery, detract greatly from the probative weight of Dr. McDaniel's testimony.
Thus, after reviewing the evidence, we conclude that Ms. Boutte has connected her carpal tunnel syndrome to her slip and fall in the Winn-Dixie Store. Consequently, she is entitled to recovery all past medical expenses, which total $29,525.15.

Future Medicals
Plaintiff also seeks future medicals of $25,000-$30,000 which, according to Dr. Cenac, approximates the going rate for lumbar surgery should such an operation become necessary in the future. We are unable to award future medicals, however, as each of the physicians who testified indicated that lumbar surgery would not be beneficial to plaintiff and that its future necessity could not be predicted.[15]

Lost Past Earnings
At the time of her June 26, 1993 accident, Ms. Boutte had been working for a year and a half as a shoe salesman at Babineaux Shoe Store earning an average of $1,100.00 per month. Plaintiff maintains that she is entitled to this figure for her lost wages from June 26, 1993 through March 9, 1995, the date her trial ended, for a total of $22,500.00. Her monthly wages were corroborated by her employer who testified and by her wage records. However, the record supports a determination that she was totally disabled between the date of her accident and October 11, 1994, by which time even Dr. Cenac concluded that she could return to a light-duty occupation, one that would fit within the context of her 10% overall body disability. Because such jobs are not easy to find, particularly for a 41 year-old woman possessing only a seventh grade education and limited learning skills, for practical purposes it would seem equitable to award Ms. Boutte damages of $1,100.00 per month through the end of 1994, probably a sufficient period to find work in a reasonably healthy economy, for a total of $19,750.00, which we presently award.

Future Lost Earnings
In terms of earning from 1995 past the trial, damages are more difficult to establish. No occupational or vocational therapist or other expert was called to testify on this subject, and each of the physicians, including Dr. Cenac, agreed that Ms. Boutte could return to work in any capacity that did not require too strenuous of lifting. Neither party presented evidence as to how much this plaintiff possessing her skills could earn in this job market. Further complicating is the matter that before she acquired her position at the shoe store, plaintiff had a work history that could be described as sporadic at best.
According to plaintiff, a permanent disability with twenty-three years of loss wages would entitle plaintiff to total loss future wages of $175,000.00; with a return to work at minimum wage, her loss future wages would be some $95,000.00. Considering the limited evidence we do have before us, including plaintiff's limited education and learning capacity, we believe an award of lost future wages of $50,000.00 to be appropriate.

Scarring, Emotional Distress, Etc.
Additionally, plaintiff maintains that she is embarrassed and self-conscious about the scarring on her wrist from the carpal tunnel release surgery. She maintains that she is also entitled to damages for "the prospect of additional scarring with back surgery." For past and future scarring, she seeks $15,000.00.
As we have noted, plaintiff has not established the need for future back surgery. Therefore, we believe that an award of $8,000.00 would be appropriate. The scars of plaintiff's wrists, although smaller, are more public than would be any scars of her back.

Pain and Suffering
Although it has begun to subside, Ms. Boutte clearly has had to endure pain since the day she fell in the Winn-Dixie *310 store. As plaintiff notes, she had two operations for her wrists, multiple spinal injections and other tests. Additionally, she and others have offered some testimony to suggest that she has had to forego her occasional aerobics, housecleaning, and family visitation time, with the prospect of only limited improvement due to her permanent 10% impairment rating. For past and future pain and suffering, plaintiff seeks $200,000.00 in damages.
The record suggests plaintiff clearly has had to endure much intrusion, uncertainty and inconvenience for more than one and one-half years, with noticeable changes for the better during the weeks following her carpal tunnel release surgery. The record also establishes that, although very much reduced from its previous state, plaintiff nonetheless will have chronic pain for the rest of her life. Due to these circumstances, we conclude that she has established damages of $45,000.00 for past suffering and disability and $60,000.00 for future pain and suffering.

DECREE
The judgment of the trial court is reversed in part and affirmed in part. Plaintiff is entitled to past medical expenses of $29,525.15, past lost earnings of $19,750.00, future lost wages of $50,000.00, $8,000.00 for past and future scarring, $45,000.00 for past suffering and disability, and $60,000.00 for future pain and suffering, for a total award of $212,275.15, plus legal interest. Defendant, Winn-Dixie, to bear all costs of these proceedings.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
SULLIVAN, J., dissents and assigns written reasons.
AMY, J., dissents for reasons assigned by SULLIVAN, J.
SULLIVAN, Judge, dissenting.
I respectfully dissent. Assuming, arguendo, that the legal errors relied upon by the majority were not harmless and require a de novo review, I find that, applying the same standard of proof as did the jury to the facts of this case, that plaintiff failed to carry her burden of proving (1) that her fall was caused by "a condition existing in or on a merchant's premises" (the purple substance was not smeared) and (2) that the merchant failed to exercise reasonable care. Accordingly, I would dismiss plaintiff's claims at her costs.
NOTES
[1] Therefore, the jury did not address interrogatories directed to plaintiff's contributory negligence, apportionment of fault or damages.
[2] According to Assistant Manager David Bourgeois, these responsibilities belonged initially to dairy manager Glenn Martin, until Martin punched out at 5:37 p.m., then to Claude Simmons, another part-time employee, until Mr. Simmons' shift ended at 9:00 p.m.
[3] In the absence of such error, the jury could not be said to have erred in determining that plaintiff failed to show that defendant had constructive notice of the hazard on Aisle 13.
[4] Sec. 3734. Privileged communication between health care provider and patient

A. As used in this Part:
(1) "Health care provider" means a hospital, as defined in Paragraph (3) hereof, and means a person, corporation, facility, or institution licensed by the state to provide health care or professional services as a physician, hospital, dentist, registered or licensed practical nurse, pharmacist, optometrist, podiatrist, chiropractor, physical therapist, psychologist, or licensed professional counselor and an officer, employee, or agent thereof acting in the course and scope of his employment.
(2) "Patient" means a natural person who receives health care from a licensed health care provider.
* * * * * *
B. In noncriminal proceedings, testimonial privileges, exceptions, and waiver with respect to communications between a health care provider and his patient are governed by the Louisiana Code of Evidence.
C. An action or proceeding described in Louisiana Evidence Code Article 510(B)(2) which constitutes an exception for a health care provider to testify at a trial on the merits shall also be an exception for purposes of any discovery method authorized by Article 1421 et seq. of the Louisiana Code of Civil Procedure.
La.R.S. 13:3734(A)(1) and (2), (B), and (C).
[5] Apparently, defense counsel was unaware of recent changes in the law.
[6] In fairness to Dr. Shepherd, he did not know that the law prohibited his verbal communications with Winn-Dixie.
[7] Moreover, we observe that not only did Dr. Shepherd discuss the case with defense counsel before testifying, but he also discussed the case with defense witness Dr. James McDaniel.
[8] Dr. Shepherd was not called to the stand until after plaintiff's factual witnesses and medical expert, Dr. Cenac, when it was too late for her to elicit testimony to rebut Dr. Shepherd's medical opinions and factual assumptions.
[9] Apart from Dr. Shepherd's unfairly prejudicial testimony, Winn-Dixie also relied on an allegedly contemporaneous daily log containing several inconsistencies pertaining to whether the accident occurred on a rainy day or not and a noticeably adulterated inscription, assigned to plaintiff, as to whether she reported a slip and fall or not.

These inconsistencies, combined with the shortcomings assigned by plaintiff on appeal, serve to reduce greatly the persuasive force of Winn-Dixie's case.
[10] The fact that Winn-Dixie emphasized that its opposing counsel and Dr. Cenac were from New Orleans and Houma, respectively, since they are of no legal moment, serves only to accentuate Winn-Dixie's appeal to prejudice.
[11] Winn-Dixie suggests on appeal that Ms. Boutte waived her right to appeal this issue. In its view, her counsel did not formally object to the Court's rulings. We disagree. Plaintiff counsel clearly advised the court of its objections by informing the Court on one occasion that "this is not evidence" and, moments later, by stating, "Judge, again, this is improper argument."
[12] To suggest that many of plaintiff's claims for loss were substantiated only by fraud, defense counsel stated the following:

Defense counsel:
... Because there is a very large and loud medical/legal machine that I hear all the time. I don't know if you can hear it. It's kind of like what Ross Perot said when he was running. He hears that giant sucking sound. That's money going out. I hear that medical/legal machine turn and pump and turn because what happens is doctors have incentive to perform surgery and to find things because the lawyers will pay for it because it increases the value of their case. And the cycle goes on. Find injury, perform surgery, get money from the lawyers, increase value of the case
Plaintiff counsel:
Judge, there's no evidence of that. This is improper. This is not evidence in this case.
Court:
I'll instruct the jury. Go ahead, sir.
Our review of the record discloses that the jury in fact was not so instructed.
[13] Particularly when coupled with plaintiff's understandable surprise when she learned of defendant's illicit contacts at trial for the first time.
[14] Apparently noted for the first time at this juncture.
[15] Indeed, even Dr. Cenac concluded that the need for such an operation in the future would be speculative.